**AJIT S. ARORA, M.D., Ph.D.**
**American Board Diplomate in**
**Internal Medicine and Forensic Medicine**
**Qualified for Medical Toxicology Subboard: ABEM**
**Qualified Medical Examiner**


### INTERNAL MEDICINE REVIEW OF RECORDS

### November 29, 2005


Lyons, Brandt, Cook & Hiramatsu
Attorneys at Law
1800 Davies Pacific Center
841 Bishop Street
Honolulu, HI 96813

ATTN:          Edquon Lee, Attorney at Law

RE:            BACKMAN, Daniel
SS#:           N/A
D/I:           7/31/1997
EMP:           First Insurance Company of Hawaii
CLAIM #:       2J029128
CIVIL CASE #:  04-00348 (HG KSC)U.S. District Court
               for the District

Dear Mr. Lee:

There is a letter mentioning a lawsuit by the family of Daniel
Backman relating to the handling of Mr. Backman's Workers
Compensation claim.


EXHIBIT  2

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 2

**RECORD REVIEW:**

1.  An amended complaint from Julia M. Backman versus RSKCo
    Services.  Report states the plaintiffs have been severely and
    permanently damaged as a result of bad faith insurance claims
    practices and handling of the Workers Compensation claim of
    Daniel Vernon Backman an insurance claim investigator now
    deceased with defendant RSKCo was said to intentionally,
    wrongly and maliciously and repeatedly deny physician
    recommended surgery request.  They were said to submit only
    selected records in order to deny surgery that resulted in
    suffering and eventually his death.  He suffered injuries to
    his neck in 1997 in an accident arising from and during the
    course of his employment with First Insurance Company of
    Hawaii.  On March 9, 1999 he underwent cervical fusion surgery
    at C4-5 and RSKCo accepted the claim and paid for the March
    1999 surgery.  In April of 1999 there was noted to be a
    partial collapse and protrusion of the bone graft.  He took
    medication for pain.  On December 5, 1999 there was a
    postoperative MRI that revealed new injuries to the cervical
    spine, that is, a disk herniation.  Mr. Backman was said to
    develop a narcotic dependence.  In February of 2000 there was
    a letter submitting a psychological claim for anxiety and
    stress as a sequelae of the July 1997 accident.  In January of
    2001 RSKCo asked Peter Diamond, M.D. to comment on the surgery
    request.  He advised that non-surgical options have been
    exhausted and were not effective in relieving pain.  There
    were said to be certain clinic notes that were not provided.
    Records were said to be withheld.  When he was asked to give
    an opinion regarding the necessity of surgery, he said based
    on an MRI scan there was no definite evidence of canal or
    foraminal stenosis.  Dr. Holmes questioned the level or levels
    that might require surgery.  Six months after the surgery
    request was made, the complaint mentions that it was denied by
    RSKCo.  In a hearing in September of 2001 it was determined
    that RSKCo was liable for the proposed surgery.  An award was
    supplemented on October 29, 2001 by the director of disability
    compensation division.  He was said to suffer permanent
    partial psychiatric disability.  Mr. Backman's death was said
    to be compensable as he had chronic pain as a result of his

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 3

**RECORD REVIEW:(Cont'd)**

injury, and neck surgery did not provide symptomatic relief and he was prescribed narcotic medication and developed a dependency. He died before undergoing a second neck surgery as a result of the accidental combined toxic effects of medications prescribed for the work injury. Mr. Backman was treated with high doses of OxyContin to relieve severe neck pain. He was said to have suffered from depression and anxiety. He was said to suffer from pancreatitis from the adverse effects of medications. Count one states bad faith insurance claim practice and count two is breach in contract and count three is negligent or intentional infliction of emotional distress, count four is loss of consortium, count five is punitive damages. The complaint is from Robert D. Kawamura, attorney.

2.     Report from James R. Langworthy, M.D., occupational medicine which is a review of a Workers Compensation claim of July 31, 1997. Records were reviewed indicating there had been a motor vehicle accident in October of 1988. Mr. Backman's vehicle was struck by another vehicle on the passenger side. He was seen by a chiropractor after he developed a headache and neck discomfort. He denied a prior history of neck discomfort. The diagnosis was cervical sprain and muscle spasm with myositis and radiculitis. He was hit by a police vehicle from the right side. He was felt to have a primarily musculoligamentous strain when evaluated in January of 1990. He was using Valium up to 30 mg a day. A note in February of 1990 stated that he was getting better but in May complained of neck pain radiating to the left upper extremity secondary per the patient to the motor vehicle accident in October of 1988. Cervical traction was requested. An x-ray showed no significant bony changes. Intervertebral spaces are normal in width and the impression of the x-ray is normal cervical spine. A CT scan in July of 1990 showed a centrally bulging disk at C4-5. He was taking nonsteroidal agents. In August he received an injection and felt 50% better. There was return of discomfort in October of 1990. He received cortisone injections which by January of 1991 was said to

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 4

**RECORD REVIEW:(Cont'd)**

provide good relief and were the only thing that was giving him good relief.   These were apparently in trigger point areas.

In February of 1991 he said his neck was doing better since the accident.  He was swimming and exercising.  Impression is cervical strain and history of tension headaches.  Notes in 1992 from Dr. Yoza noted continued complaints of neck and extremity pain.  Spinal adjustments were being done.  A note of November 1994 from Dr. Yoza said the case was closed but in April of 1995 he noted the patient was experiencing an intermittent neck and thoracic pain.  In January of 1996 the patient was reopening his case as he had flareup of pain and numbness and complaint of headache and neck pain and back pain.  In March of 1996 he was seen for reevaluation of hypertension, anxiety disorder and hyperlipidemia.  He noted a recent exacerbation of old neck pain from an injury in 1988 when broadsided by a police officer.  Hypertension was said to be under suboptimal control.  In November of 1996 he said that the discomfort on the neck and upper back was related to the motor vehicle accident of 1988.  An MRI of July 1997 showed a small focal central C4-5 disk protrusion which did not compress the spinal cord.  The report in August of 1997 noted an impression of cervical disease with worsening symptoms, possibly related to facets with muscle spasm.  An EMG was negative for significant processes.  In October he stated he had severe pain in the neck.  A note in 1998 stated he was a 39-year-old fraud insurance investigator.  He also complained of pain in the elbow to the forearm.  He received injections in the neck and elbow.  In November of 1998 a note states he wants to try taking Percodan and stop Ultram and Tylenol with codeine.  A note in December of 1998 stated he has had history of neck and left arm pain for ten years after an auto accident.  An MRI of January 1999 showed little change.  The exam is stable, cervical spine MRI with midline C4-5 protrusion of disk material.  In January of 1999 he was prescribed OxyContin 40 mg as well as Xanax.  A note in February of 1999 stated pain has gotten progressively worse

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 5

**RECORD REVIEW:(Cont'd)**

since 1988.  The case was closed in 1996 because the insurance which covered the case sold out.  In 1997 when seen nothing was recommended.  In 1998 he was seen by Dr. Smith due to worsening neck pain.  He since had cortisone injections.  In February of 1999 an anterior cervical fusion was recommended.

He denied any new trauma or treatment after signing and settling his claim.  In July of 1997 he noted a dramatic change in neck pain.  He noted no specific new injury in 1997 but suddenly had multiple episodes of increasing pain secondary to activities at work.  The impression was herniated nucleus pulposus at C4-5 as well as chronic cervicothoracic myofascitis and cervicogenic headaches.  It was felt in the report from Dr. Diamond that the July 1997 claim was a permanent aggravation of the previous 1988 injury with 50% being apportioned to the July 31, 1997 exacerbation.

In March of 1999 there was anterior cervical fusion at C4-5. Postoperative diagnosis was central disk herniation at C4-5. By May he was continuing to complain of pain and had a refill of medications Celebrex and Ultram.  He received trigger point injections in July of 1999.  There was an exacerbation of the neck pain in July.  This was said to be perhaps as he was working long days and extended hours.  He was prescribed Percocet.  He was said to be diagnosed with fibromyalgia and myofascial pain in September of 1999.  Disk herniation was said to be much improved.  It was said that appropriate rating and closure of the case could be undertaken at any point in time.  However, five days later the reports from Dr. Razzuk stated he was unable to tolerate pain in his neck and he was recommended to begin taking OxyContin by Dr. Smith at 20 mg. He was to discontinue other medications except for Xanax.  In November he was put back on OxyContin and started on Neurontin.  In November he reported a recurrence of symptoms but felt it was unrelated to his previous injury.  An MRI of December 1999 noted no evidence of significant focal disk herniation or canal stenosis or cord compression.  On December 16th he still complained of acute pain in the neck, only minimally tolerated with medications.  On December 22nd he was requesting return to work and he was cleared by Dr. Marshall.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:    Edquon Lee, Attorney at Law
RE:     BACKMAN, Daniel
November 29, 2005
PAGE 6

**RECORD REVIEW: (Cont'd)**

In January of 2000 Dr. Smith said that there was no indication
for further operative treatment that the fusion was well
healed.

In January of 2000 there was a complaint of chest pain with
anxiety. There was a normal treadmill. In March of 2000 he
reported domestic disputes related to his chronic condition
over the last several weeks which was causing stress. He was
given refills for OxyContin 20 and 40. A report in April 2000
stated he was good for about six months after surgery and then
returned to work and had more problems. He feels stressed.
He is taking OxyContin 30 mg three times a day and oxycodone
5 mg four tablets a day, also Neurontin, Norvasc and Lopid.
He has had chronic neck pain following a fusion. It was felt
there was no good solution to his problem. Dr. Chow does not
see anything that can be corrected with surgery. In June of
2000 complaints included chest pain. He is taking OxyContin
80 mg three times a day and Xanax up to 4 mg.

A note in October of 2000 from Dr. Graham stated he has a long
history of neck pain and radicular pain; onset of symptoms
began with a motor vehicle accident in October of 1988. He
was treated conservatively from that year; in 1997 the pain
began to increase. An MRI scan was done and he underwent
surgery. Six months after returning to work he noted
increased neck pain. He has been taking narcotics on a
chronic basis and sees a pain management specialist.
Impression is persistent cervical radiculopathy secondary to
C4-5 lateral stenosis and chronic neck pain due to cervical
spondylosis status post cervical diskectomy and fusion. Also
familial hyperlipidemia and hypertension and narcotic
dependence. A note in December of 2000 mentions he continues
to suffer from chronic neck pain and requires narcotics. He
discontinued MS Contin due to mental side effects and
constipation. An MRI cervical spine scan showed at C4-5 a 2
mm central disk protrusion, although no significant cord
compression. At C4-5 status post anterior fusion, at C5-6 and
C6-7 no significant disk bulge. Impression is C3-4 2 mm
central canal disk protrusion. On December 22nd in a report
from Dr. Graham options included conservative treatment or

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:    Edquon Lee, Attorney at Law
RE:     BACKMAN, Daniel
November 29, 2005
PAGE 7

**RECORD REVIEW:(Cont'd)**

surgery.  The patient will think about the options.  On December 27th he said his neck pain was getting worse and he may need more pain medications.  OxyContin was increased to 80 mg three times a day and 40 mg twice a day.  On February 9, 2001 the report states he is taking OxyContin 160 mg three times a day.  He was having problems with his marriage.  He was also using a sedative alprazolam.  He complained of having marriage problem secondary to chronic neck pain.  On April 11, 2001 he said he did not know why he ran out of his medications so fast.  He denies overusage.  On May 3, 2001 Dr. Otaka received a call from the patient's father stating he was suicidal.  He feels he was taking too much medication.  The impression is reactive depression and chronic pain syndrome as well as anxiety.  On May 25, 2001 a prescription for Ambien 10 mg is called in.  On July 2, 2001 the patient came in stating the prescription his father had picked up in the morning had been lost.  This history had been repeated in the past.  On July 8, 2001 there was also mention of his father having lost a prescription.  It is felt that there was "drug seeking behavior" that is manifesting.

On September 20, 2001 in a letter from Dr. Otaka the report states he is fighting to get a surgery and the progress has been halted by the insurance company's lawyers.  He was recently arrested by police for an unrelated situation.  The medication was taken away by police.  In November he decided to undergo surgery, however the insurance carrier refused.  He has since engaged in a long battle with the insurance carrier.  He also reports marital problems.  The note mentions narcotic dependence and anxiety disorder as well as hyperlipidemia.  An x-ray in November of 2001 noted solid appearing anterior fusion of C4-5.  On November 20th a note indicated he was struggling with weaning off narcotic medications.  A CT scan in December 2001 stated good bony fusion with no disk material.  The impression is limited exam of the cervical spine particularly lower due to streak artifact from the girth of the patient.  There were mild disk bulges and other degenerative changes of the cervical spine.  On December 7, 2001 a solid block vertebral body was present in regard to the fusion, although mentioning of degeneration at C3-4 disk.  There was osteophyte formation.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 8

**RECORD REVIEW:(Cont'd)**

On June 2, 2002 Mr. Backman was found unresponsive. An autopsy report showed accidental poisoning of oxycodone, alprazolam and methadone. Facts did not support a suicidal attempt. He was suffering from depression and anxiety felt to be part of his chronic pain syndrome. He was placed on methadone to help his withdrawal symptoms. He was said to be at the time of his death down to a dose of OxyContin at 80 mg twice a day and methadone 10 mg three times a day.

3.    Report from Dr. Lind on July 17, 2002 stated that psychiatric impairment was attributable to injury of July 31, 1997.

There was a discussion in the report also mentioning pancreatitis was accepted as part of the claim and there was a 32% combined impairment of the person related to the claimant at the time of death.

4.    Letter from Leroy T. Kuwasaki, August 26, 2002 stating before Mr. Backman died he was successful in persuading an approval for the second surgery.

**DEPOSITION OF MICHELLE JOHNSON, REGARDING RECORDS:**

1.    Exam date of October 24, 2000 noting chronic neck pain due to cervical spondylosis as well as persistent cervical radiculopathy secondary to stenosis at C4-5, also mild lateral stenosis at C5-6. Recommended to repeat MRI scan.

2.    Neurological report from John F. Graham, October 24, 2000, noting long history of neck and radicular arm pain in this 41-year-old. Report reviews the history and mentions that because of chronic pain he has been taking narcotics on a chronic basis and seeing a pain management specialist. There is a positive medical history for an anxiety disorder for which he is seeing a psychiatrist. He also has been hospitalized for pancreatitis in the past. Family history notes both parents with hyperlipidemia and father with hypertension and history of MI. He has been off work since the end of January of 2000. A physical exam noted decreased

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:       Edquon Lee, Attorney at Law
RE:         BACKMAN, Daniel
November 29, 2005
PAGE 9

**RECORD REVIEW: (Cont'd)**

lateral motion of the neck to the left. X-rays were reviewed. An MRI in 1999 noted the canal at C4-5 appeared to be well compensated with no significant cord compression.  The impression is however persistent cervical radiculopathy secondary to C4-5 lateral stenosis, left greater than right and chronic neck pain due to cervical spondylosis.  Also diagnosed is anxiety disorder and narcotic dependence as well as hypertension and familial hyperlipidemia.

3.    A letter of May 1, 2001, noting that radiologist Dr. Yuh did not see significant stenosis or neuroforaminal narrowing at C4-5 which conflicts with my interpretation of the MRI.  There was a 50 to 60% chance he would benefit from the surgery proposed in December of 2000.  It is my concern that continued delays not only may undermine any gains to be obtained by surgery but lengthen postoperative recovery.

4.    Report from Dr. Graham, November 14, 2001 for complaint of neck and shoulder pain.  Notes under medications OxyContin 40 mg three times a day and 10 mg of methadone a day.  Exam noted blood pressure of 144/90, weight is 208 pounds.  He was described as being in mild distress due to neck pain. Impression is chronic C5 radiculopathy and recent onset of C3-4 radiculopathy as well as narcotic dependence, anxiety disorder and hyperlipidemia.

5.    Progress notes from December of 2001 noted visit on the 18th, stated chief complaint of increasing pain in the neck and radiating to the shoulders.  Current medications were OxyContin 40 mg two cr three times a day and methadone 10 mg once a day.  An appointment for December 21st was rescheduled for the 26th.  On the 26th there was said to be a 3:30 p.m. appointment, at 3:45 the patient's home was called and he said he mixed his days up and would call back.  He called on December 27 to reschedule his appointment.  He was then reported as expired on January 2, 2002.

6.    MRI report of the cervical spine, December 15, 2000. Impression is C3-4 2 mm central focal disk protrusion.  There was no significant cord compression or neuroforaminal narrowing.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 10

**RECORD REVIEW:(Cont'd)**

7.   Cervical spine x-ray, November 14, 2001, notes solid appearing anterior fusion at C4-5 and mild degenerative disk narrowing at C5-6.

8.   Letter to Dr. Graham dated February 22, 2001 from David M. Robinson which states it might be helpful if you could clarify for the insurance carrier the fact that an MRI does not show any new changes does not mean there is not a significant problem, although Dr. Yuh, the radiologist indicated there was no significant central canal stenosis or neuroforaminal narrowing at C4-5.  Dr. Graham opined the MRI showed bilateral foraminal stenosis at C4-5, worse on the left.  The records were reviewed which included a note on April 4, 2000 from Gregory H. Chow, M.D. stating there had been an anterior neck fusion at C4-5 the year earlier and he had done fairly well but subsequently developed increasing neck pain.  The problems were worse when he returned to work.  There was a history of high cholesterol, hypertension and skin cancer.  Dr. Chow recommended non-surgical measures along with psychiatric treatment and interventional pain management technique from Dr. Wang.  An ER record on April 12, 2000 noted Mr. Backman had asked for Demerol for pain but this was refused due to concern about respiratory depression.

On reviewing the records the note on June 23, 2000 from Dr. Izuta stated that Mr. Backman also worked as a game warden part time.  He was placed off duty.  He was recommended to have physical therapy.  He noted the patient had evidence of an excellent surgical outcome.  He said there was an obvious problem between the patient and his employer.  He was seen in the emergency room on July 16, 2000 for chest pain.  He said he had a long history of anxiety associated with chest pain.  A cervical spine MRI of December 15, 1999 noted no significant focal disk herniation or stenosis.

The report ends by stating I am afraid I cannot specifically answer question in regards to the necessity of proposed surgery at C4-5.  There was no indication that electrodiagnostic studies had been performed.  I am not at all sure if the radiating symptoms of which he complains are

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 11

**RECORD REVIEW:(Cont'd)**

    specifically attributable to surgically correctible lesion at C4-5. When symptoms were described by Dr. Chow on April 4, 2000 he noted that symptoms were not in a C4-5 distribution. An independent reading of films was recommended by Dr. Diamond.

9.   Letter from law firm of Robinson & Chur mentioning due to personality conflicts he was withdrawing his counsel from Mr. Backman.

10.  Note from Stephen M. Holmes, neuro-radiologist, June 6, 2001, impression of which is MRI of the cervical spine demonstrates mild diffuse degenerative disk disease and previous solid bony fusion at C4-5 without foraminal or canal stenosis.

11.  Letter from New Counsel Leroy T. Kuwasaki, July 11, 2001, asked for review of the employer's denial of the request for surgery that mentioned the claimant has chronic pain and was heavily medicated and depressed and loses track of time. Another letter mentions that he had memory lapses and was suffering from depression.

12.  Letter from Honolulu Sports Medical Clinic, March 7, 2001, after reviewing records the opinion states I cannot specifically answer the question in regard to the necessity of proposed surgery at C4-5. The radiologist reading of films was recommended.

13.  Decision from State of Hawaii which mentions Dr. Holmes, the selected neuro-radiologist, reviewed the December 15, 2000 MRI only and did not review the x-ray films in 1999 and the report states his opinion is based on incomplete medical records. Several pages of this report have been missing.

14.  Letter from Dr. Graham, January 23, 2001, stating that his expected MRI is unchanged but he continues to have neck and arm pain which could be helped by surgery at C4-5.

15.  Denial of request for surgery, June 22, 2001, Dr. Diamond in his report of March 7, 2001 questioned whether surgery would

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 12

**RECORD REVIEW:(Cont'd)**

resolve symptoms because radiating symptoms of which he complained are not attributable to a surgically corrected neuro-condition at C4-5.

16. Letter from Leroy T. Kuwasaki, July 17, 2001, noting that a letter that was written by Dr. Otaka be revised as the letter could be misinterpreted and he directs Dr. Otaka had revised the letter, stating he has been on chronic narcotic medication which can interfere with his ability to think adequately and there have been memory lapses.  I believe he is becoming addicted to pain medication but the insurance company has denied definitive surgical intervention.

**DEPOSITION OF NANCY LIND REGARDING AVAILABILITY OF RECORDS:**

1. Medication list from October 1999 through November of 2000 notes multiple prescriptions fro OxyContin, Neurontin and Xanax and several for MS Contin.

2. Present illness history sheet states anxiety since 1994 related to increased workload since 1994.

3. Progress note, October 29, 1999, Mr. Backman speaks animatedly about his work and how much he enjoys it.  He stated his injuries are having an effect on his stamina.  He has had a very good adaptation to the OxyContin/Oxy IR combination.  He was also given a prescription for Neurontin.  Overall he likes the effect of the OxyContin combination.  It helps him to have more mobility and improves his mood.

4. Additional notes regarding use of OxyContin in November of 1999.  On November 24th he said his present dose helped him control his pain and sleep better.  He was given prescriptions for his Klonopin and Xanax as well in November of 1999.  In January of 2000 OxyContin was increased to a total of 120 mg. This was said to allow him to have a positive life as opposed to chronic pain without it.  In January 2000 he was said to have a panic attack which he said followed ruminations about unfair treatment at work.  There was said to be no change in the use of his narcotic medication.  This includes OxyContin,

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:      Edquon Lee, Attorney at Law
RE:        BACKMAN, Daniel
November 29, 2005
PAGE 13

**RECORD REVIEW:(Cont'd)**

oxycodone, and Xanax for panic.  In February a note states use
of narcotic medication is the same.  He is now said to be on
a stress leave.  His employer was said to be giving him a hard
time and pressuring him to do things.  He felt he was being
treated unfairly.  On a February 23rd note there was mentioned
inability of his wife to deal with situational stresses that
she was under.   This note now says his pain control was
inadequate.  "He has been taking a bit more of the OxyContin
than   we   agreed   upon."     He   was   spoken   to   about   the
inappropriateness  of  increasing  it  without  speaking  to  the
physician.  In March of 2000 it was agreed that he would take
time off work, he was to cut back on OxyContin to a current
level of 40 mg three times a day and 20 mg twice a day.   A
note on March 15th states he continues to struggle with pain.
The relationship with his wife is fairly tense because of all
the things she is going through regarding her feelings about
work and old work issues and dealing with him while he is in
pain.  On March 30th he said he was upset because his wife had
been upset with him.  His wife was frustrated and yelling at
him and because of this he took OxyContin excessively.   This
was not approved and he was not given extra.  He held firm
with not giving him additional medication and noted that Mr.
Backman  was  upset  with  him.    He  wanted  his  wife  at  the
therapy.   There had been a painful interaction she had with
Dan's parents who lived upstairs.  A note on April 3rd stated
got extra medication from Dr. Razzuk.  The note states I think
this is helpful because it showed Danny needs to buckle down
and get into regular medication routine so he does not use
narcotic medications to solve his emotional problems.  A note
on  April  11,  2000  states  that  Dan's  father  called  and
requested more medication because he was in pain.  He was told
that Dan tends to rely too much on pain medication to get by
and I am concerned about his rapidly escalating dosage and
dependence.  Dr. Chow said that there was a solid fusion and
he did not think there was anything more that could be done
surgically.  He was at a loss to explain why he was in such
great pain.  He thinks there was some supratentorial component
to this and we should be cautious about increasing his
medication and be aware of over-dependence.  Two days later on
the 13th the note states his pain increased and he is having

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:      Edquon Lee, Attorney at Law
RE:        BACKMAN, Daniel
November 29, 2005
PAGE 14

**RECORD REVIEW:(Cont'd)**

a difficult time.  Report states he went to the hospital when
his "wife couldn't rouse him."  911 was called.  He was found
to have no narcotic medications indicating they were either
stolen or may have been left in the ambulance.

5.  A progress note of April 26, 2000 states that Dan came in with
his father.  Dan was noted to be hanging around the house half
sleeping all day along, said to be not because he is stoned
but because he is afraid to move due to pain.  He was given
additional OxyContin as well as a sleeping medication Ambien.
On May 9th he was given another sleeping medication Sonata.
The note mentions he saw Dr. Okamura who declined to take care
of him.  A note on May 22, 2000 stated that he was taking too
much Xanax.  He was sleeping so deeply with sleeping aid that
he wet this bed a few times.

6.  Progress note on June 13, 2000 notes chest pain likely due to
panic attacks.  He was given Xanax.

7.  Progress note, July 24, 2000, stating he is in good spirits
and the marriage has improved.  X-rays showed no bone spurs in
the neck.  Narcotic medication was refilled.

8.  Progress note of August 8, 2000 states increasing pain in the
neck and shoulders which he thinks is related to excessive
physical therapy.  He again increased OxyContin and ran out
early and was chided again for taking the initiative without
consulting the physician.  He was said to feel embarrassed
about this.

9.  A note of August 18, 2000 states he is discouraged in an
ongoing way of his chronic pain situation.  He has actually
fallen asleep and fell off the toilet on a couple of
occasions.  A note on August 21, 2000 again states he had
taken more OxyContin than he was supposed to because his pain
had increased.  He has always contrite afterwards and feels
embarrassed but he was told that is not good enough.  He has
got to play by the rules of the physician.  He is still having
marital problems.  He describes his wife as Jekyll and Hyde.
She refuses to see a therapist.  She is described as
vindictive.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:    Edquon Lee, Attorney at Law
RE:      BACKMAN, Daniel
November 29, 2005
PAGE 15

**RECORD REVIEW:(Cont'd)**

10. A progress note on September 12, 2000 stating his pain level
    increased beyond current medication level.   He wanted to
    increase  OxyContin  which  the  physician  said  he  was  not
    prepared to do.

11. Progress note, September 19, 2000, noting an evaluation in the
    emergency room for pancreatitis.   In October he was looking
    pale and still having upper abdominal pain.   MS Contin was
    increased.

12. Progress note, October 30, 2000, stating Mr. Backman saw a
    neurosurgeon  who  told  him  his  increased  pain  was  due  to
    collapse  of  the  cervical  fusion.   Another  MRI  was  ordered.
    His wife was with him.   There was mention of strain in the
    marriage because he is not doing anything with the children
    and she is about to start her job.  He is pleading I increase
    the MS Contin to a total of eight tablets a day.   He is also
    having chronic constipation.

13. Progress note, November 13, 2000, noting that Mr. Backman had
    seen  Dr.  Otaka  who  also  prescribed  narcotics.    The  note
    mentions I don't believe there is a problem with manipulation
    here,  however.   He  is  given  a  prescription  for  total  of
    OxyContin 200 mg twice a day.

14. Letter from Dr. Lind, August 8, 2000, stating I am concerned
    about  lack  of  progress  and  the  pain  is  increasing  despite
    substantial amounts of narcotic medications OxyContin 240 mg
    and Oxy IR 15 mg, the doses of which have been increased.

15. Letter to Dr. Razzuk from attorney, mentioning we are now face
    with the issue of whether or not anxiety attacks or stress are
    compensable sequelae of the 1997 injury or a new and separate
    event.

16. Letter dated February 22, 2000 stating that Mr. Backman had
    the worse weekend of his life, mentioning his wife and him are
    having serious problems.   His children are crying and his
    parents are upset.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 16

**RECORD REVIEW:(Cont'd)**

17.   Psychiatric evaluation, Mr. Backman seen on October 18, 1999, last visit August 21, 2000. Diagnosis under Axis I is anxiety disorder and pain disorder associated with psychological factors and general medical condition. Under Axis IV chronic pain moderate to severe stressors along with various family pressures. Under complaints states matters were complicated by further marked stress at his working place, also panic attacks in late October and he still has anxiety attacks when under pressure in contact with work. He is noted also to be a conservation officer at first aid parks and marine and in law enforcement where he is authorized to carry a weapon. He said he was asked to participate in fraudulent practices and he started with his anxiety problems along with workload since 1994.

18.   Letter stating Dr. Otaka called. He does not know the reason for Mr. Backman's death. His daughter found him about 12 hours after he had died. There were empty pill bottles of pain medications by him. Report states he does not understand because Dan just won approval for back surgery.

19.   Phone call note states autopsy showed accidental overdose.

**DEPOSITION OF JUDY PERALTA REGARDING RECORDS:**

1.   Progress note from Maurice W. Nicholson, January 23, 1999. Stated broadsided by police vehicle. The symptoms include dizziness and headache and fatigue. Medications include Valium as well as Lopid for cholesterol, also Esgic.

2.   Report from Dr. Nicholson, January 24, 1990. Report more legible than the previous handwritten note. Indicates he was hit by a police vehicle from the right side. He had a bruise on his left thigh at the time of the injury. He began to have neck pain, headaches and dizziness and tiredness. Also some pain in the left arm and tingling in the fourth and fifth fingers. Headaches are on the left side of the head. The report states I think this man has primarily a musculoligamentous strain. I think there is some superimposed anxiety. He has been using Valium up to 40 mg a day.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:      Edquon Lee, Attorney at Law
RE:        BACKMAN, Daniel
November 29, 2005
PAGE 17

**RECORD REVIEW:(Cont'd)**

3.   Note from Dr. Nicholson, March 29, 1990, stating he has had no
     episodes of vertigo since his previous visit.  His headaches
     are decreasing in frequency and severity.

**DEPOSITION OF SHAUNTAY NISHIKAWA FOR RECORDS:**

1.   History and physical, September 19, 2000, complaint is severe
     abdominal pain, nausea and vomiting for 12 to 15 hours
     duration.  History notes 41-year-old male with history of an
     anxiety disorder, high cholesterol and triglycerides.  He
     presents through the emergency room with persistent abdominal
     pain, diarrhea, nausea and vomiting.  This is his second
     emergency room visit today and an abnormal amylase and lipase
     level was noted.  A total amylase was 157 and pancreatic
     amylase 130.  On return to the emergency room the white count
     had climbed to 15200, amylase had climbed to 776.  Abdominal
     CT scan showed a fatty liver.  He was admitted for treatment
     of    pancreatitis    presumed    secondary    to    severe
     hypertriglyceridemia.  He was treated for hyperlipidemia since
     1982, however, has discontinued medication.  There has been an
     anxiety disorder since 1994, currently on OxyContin and
     Phenergan for control of neck pain.  Hypercholesterolemia and
     hypertriglyceridemia are on both sides of the family.  On exam
     blood pressure is 161/97.  The abdomen was markedly distended
     and diffusely tender, more so in the epigastric region.

2.   Discharge summary for admission September 19 to 25, 2000.
     discharge diagnosis is pancreatitis, hypertriglyceridemia,
     fever secondary to pancreatitis and hypertension.  Report
     notes his lipid profile was markedly skewed with a
     triglyceride level of 9924 and cholesterol of 1253.  Later
     cholesterol diminished to 443 and triglyceride to 650 and he
     was discharged on TriCor for familial hypertriglyceridemia.
     Report from Dean Otaka, attending physician.

3.   Progress note, October 10, 2000, includes diagnosis of chronic
     neck pain status post C4-5 fusion and also chronic pain
     syndrome and also anxiety, hypertension, and status post
     pancreatitis.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 18

**RECORD REVIEW: (Cont'd)**

4.   Progress note, November 15, 2000 titled Workers Comp visit,
     states chief complaint of neck pain, chronic, requesting
     something for breakthrough pain.  Currently on OxyContin 80 mg
     one three times a day.

5.   Progress note, November 16, 2000, notes cholesterol 364 and
     triglyceride 1547.

6.   Progress note, December 27, 2000, states pain is getting
     worse, needing more pain medication.  Currently on OxyContin
     80 mg three times a day and 40 mg once a day.  Complains of a
     shooting throbbing pain in the left arm on attempting to do
     house work.  He has severe pain.  Weight is 178.75 pounds.  He
     is described however as appearing slightly emaciated and pale
     but in no acute distress.

7.   Progress note, December 28, 2000, states chronic neck pain
     secondary to C4-5 fusion with disk bulging.  He was diagnosed
     with bronchitis.

8.   Progress note, January 10, 2001, states chief complaint of
     neck pain and blood pressure going up.  Has definitely decided
     on surgery.

9.   Progress note, January 17, 2001, admits to taking more than
     prescribed amounts of OxyContin due to increasing neck pain.

10.  Progress note, January 30, 2001, states increasing pain, more
     frustration due to prolongation of process to have surgery
     performed.  Needs more OxyContin.  Other details state wife is
     unable to deal with the patient's disability and children are
     very sad.

11.  Progress note, February 9, 2001, complains of increasing neck
     pain, using 240 mg of OxyContin per day, states problems with
     marriage due to inability to function at home, wife frustrated
     due to the patient's inability to go out and help with home
     and kids.   On March 2, 2001 he was noted to be taking
     OxyContin 160 mg three times a day and alprazolam 2 mg up to
     five times a day.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:    Edquon Lee, Attorney at Law
RE:      BACKMAN, Daniel
November 29, 2005
PAGE 19

**RECORD REVIEW:(Cont'd)**

12.  Progress note, March 13, 2001, stating the patient with marriage problems related to chronic neck pain and increased stress.

13.  Progress note, April 11, 2001, weight is 197 pounds, states attempted to pick up OxyContin prescription on April 8 which was last filled on March 27th. The patient does not know why he ran out so fast. Denies over-usage. Average is 21 days between pickups. The note states stress compliance with meds. A prescription is given for #100 OxyContin 80 mg.

14.  Progress note, April 18, 2001. On examination abdomen is described as obese. There was also noted to be 1+ edema. Chief complaint is weight gain as well as edema. Assessment includes hypertension stable.

15.  Sheet labeled toxicology screen not dated. In the urine is noted possible methadone and metabolite and possible oxycodone, urine screen for opioids is positive.

16.  Progress note, April 27, 2001, notes cholesterol of 289 and triglyceride of 1335, HDL cholesterol is 31.

17.  Progress note, May 3, 2001, weight is 203 pounds. There is a call from Mr. Backman's father. The day preceeding he stated "my son is suicidal." He was advised to go to the emergency room but did not do so and presented to the clinic, he said his father was invading his privacy. He feels he has to take too many medications. Assessment is reactive depression and chronic pain syndrome and increased anxiety.

18.  Prescription for OxyContin on June 18, 2001 for 80 mg two tablets twice a day. He was prescribed 120.

19.  Progress note, July 8, 2001, stating father "lost" prescription. Went to emergency room for pain medications. Was given six tablets. Today returns for additional prescription. The note states drug seeking behavior is manifesting itself.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 20

**RECORD REVIEW:(Cont'd)**

20.  Progress note, July 20, 2001, states the patient is addicted
     to alprazolam and OxyContin for chronic neck pain and chronic
     pain syndrome, already requesting more alprazolam. Weight is
     205 pounds with note stating continues to gain weight.
     Assessment is gastritis and GERD and hypertriglyceridemia
     familial as well as hypercholesterolemia and drug induced
     myalgias.

21.  Progress note, July 22, 2001, stating someone from K-Mart had
     called stating that someone had turned in OxyContin from a
     previous prescription.

22.  Progress note, August 2, 2001, stating the patient called, he
     was arrested over the weekend. He was incarcerated for
     beating up his wife. He said police had taken 70 to 80 pills
     from his personal belongings and his pain medication
     OxyContin. Assessment states unknown if the patient is drug
     seeking again with story of police taking his drugs.

23.  Progress note of August 29, 2001 states gained weight due to
     sedentary lifestyle due to neck pain. He is unable to control
     hypertriglyceridemia because he is unable to exercise. On
     examination he is described as obese and very fatigued.

24.  Progress note, October 19, 2001, noted there was a no show for
     the last appointment. He showed up late by two hours. Blood
     pressure is 142/92.

25.  Progress note, November 19, 2001, states slowly weaning off
     OxyContin; has an extra 80 mg of 16 tablets as well as
     methadone. Medications include Plendil, Effexor, alprazolam,
     OxyContin, methadone, Prevacid and TriCor. He said he was
     asked formally by his wife for a divorce but he refused.
     Blood pressure 140/90. Assessment includes narcotic addiction
     slowly being weaned as well as depression and anxiety said to
     be stable. The plan is to decrease OxyContin to 80 mg three
     times a day. A letter states he decreased from 160 mg of
     OxyContin three times a day to 120 mg in the morning, 80 mg at
     noon and 120 mg at the evening with the 10 mg dose of
     methadone. This note is dated November 20, 2001. On November

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 21

**RECORD REVIEW:(Cont'd)**

19th his dosage was decreased to 80 mg three times a day and 20 mg of methadone.  There was still marital discord.  He refused to divorce. Another letter states this stems from Mr. Backman's unfortunate prolonged legal battle to have the cervical neck pain corrected.  "Mr. Backman's wife Julie does not believe that he is trustworthy and that he has debilitating neck pain and is constantly frustrated by his laziness and unwilling to help in the house with cleaning and taking care of two children."

26.  Progress note, August 20, 2001.  Assessment includes familial hyperlipidemia which is worse, also dietary noncompliance and hepatocellular dysfunction.

27.  Prescription for alprazolam 2 mg five times a day.

28.  Progress note, December 19, 2001, mentions narcotic addiction, slowly being weaned.

29.  Letter from Dr. Otaka, April 14, 2002, stating that the autopsy report showed an accidental poisoning.  The facts surrounding the situation at that time did not support a suicidal attempt.  He was treated with high doses of OxyContin.  Depression and anxiety with reported chronic pain syndrome.  A neurosurgeon had agreed his problems were consistent with his symptoms on an MRI which could be corrected and he is compliant on reducing the intake of pain medication.  He was placed on methadone to help with withdrawal symptoms.  The letter continues, I do not believe his situation was consistent with suicide.  At the time of his death he was taking 80 mg twice a day along with methadone 10 mg three times a day.

30.  Autopsy report for date of death, January 2, 2002.  Findings are:
     a.  Acute congestion, lungs, and pulmonary edema.
     b.  Cerebral edema with tonsillar herniation.
     c.  Massive hepatomegaly.
     d.  Splenomegaly.
     e.  Cardiomegaly with left ventricular hypertrophy.
     f.  Moderate occlusive coronary atherosclerosis.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:    Edquon Lee, Attorney at Law
RE:      BACKMAN, Daniel
November 29, 2005
PAGE 22

**RECORD REVIEW:(Cont'd)**

Postmortem toxicology noted oxycodone at 0.5 mcg per milliliter which is above therapeutic level, methadone at 1.4 mcg per milliliter which is at a fatal level, EDDP that is methadone metabolite 0.22 mcg per milliliter and alprazolam 130 ng per milliliter which is at toxic level. The conclusion states he died as a result of combined effects of methadone, oxycodone and alprazolam; immediate cause of death is accidental poisoning. Report from William W. Goodhue, Jr. M.D. medical examiner, February 13, 2002.

31. Record review, March 7, 2001 from Honolulu Sports Medical Clinic.

32. Report, September 11, 2001, notes longstanding history of anxiety and depression, also high blood pressure which is now 149/94. He was seen after being evaluated for acute pancreatitis and having triglyceride level of nearly 6000.

**DEPOSITION OF JESSICA RISHFORTH FOR RECORDS:**

1. Progress note, July 6, 1999 for injury dated July 31, 1998, stating the patient does not feel he can continue the type of work schedule in light of postsurgical pain. Assessment is herniated disk of cervical spine status post surgery. There are additional progress notes including a visit of July 13, 1999, stating the exacerbation of neck pain, etiology is unclear but perhaps working long days and extended hours. Prescribed Percocet one twice a day.

2. Progress note, August 12, 1999, stating he has been doing a lot of hard camera surveillance work. He has had a lot of stress as he may have tapped into drug rings etc. and is concerned about safety. Impression is status post neck surgery and situational anxiety and chronic pain.

3. Progress note, August 20, 1999, states significant pain in the neck. He is working very hard. Assessment is neck pain exacerbation. Will begin the patient on OxyContin. This was said to be only a limited course totaling about a month with

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:    Edquon Lee, Attorney at Law
RE:      BACKMAN, Daniel
November 29, 2005
PAGE 23

**RECORD REVIEW:(Cont'd)**

weaning in two weeks.  A note on August 26, 1999 states OxyContin was working well.  On September 23rd he was prescribed Soma, a muscle relaxant as well as a sedative Xanax and advised not to take them at the same time.

4.  Progress note, September 27, 1999, prescribed Xanax and OxyContin.  On further progress notes it was noted Dr. Lind was prescribing OxyContin.

5.  Progress note, December 16, 1999, on examination notes full range of motion of the neck with pain at the extremes.

6.  Progress note, December 21, 1999, noting he wanted to try to go back to work but his boss would not let him because he is taking OxyContin at 20 mg twice a day and he was to come after taking his dose to prove to Dr. Marshall he is fully capable of functioning under the influence of this drug.

7.  Progress note, January 13, 2000, stating he saw Dr. Smith with the MRI; he did not believe there was any further injury.  He was seen again for a neck pain exacerbation on January 18, 2000.

8.  Progress note, January 25, 2000, stating the patient has had some anxiety from work-related situation that he said exacerbated neck pain.  He said he had not increased his medications.

9.  Progress note, June 1, 2000.  The patient notes persistent pain essentially unchanged from before.  There was some adjustment of pain medication by Dr. Lind.

10. Progress note, August 24, 2000, noting that Mr. Backman was pursuing evaluation at Spinal Surgery Clinic in San Francisco. Report states his pain level is requiring increasing levels of medication for control.  On exam, range of motion noted significant pain in all extremes except extension and rotation.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 24

**RECORD REVIEW:(Cont'd)**

11.  Additional progress notes reviewed include July 13, 1999,
     prescription for Xanax as well as Lopid.  Assessment in July
     was anxiety disorder and sleep disturbance.  He was said to be
     working at an erratic work schedule.  He has an anxiety
     disorder.

12.  Progress note, March 30, 2000, stating that Mr. Backman needed
     a refill of medications.  He said he did not run out early
     because of excessive intake but because the bottle had spilled
     during a domestic dispute and apparently some of the pills
     were lost.  He did say he took more of the medication than
     recommended he said because of excessive pain.  In addition to
     what was prescribed the patient requested sleeping medication
     but Dr. Razzuk writing this report stated he did not feel
     comfortable giving him any further medication since he was on
     a significant amount of narcotic medications at that time.

13.  Progress note from Gregory H. Chow, spinal surgeon, April 4,
     2004, stating that postoperatively he did fairly well but
     after about six months when he returned to work he felt
     stresses at work made his problems worse.  He described his
     pain as very severe without medications and tolerable on
     medication.  Although he said his stresses at work made his
     problems worse, currently he had been off work for two to
     three months.  Social history notes he smokes a half pack of
     cigarettes per day.  Impression states very complicated
     problem of chronic neck pain.  At this time I do not think
     there is a good solution.  I do not see anything that can be
     corrected with surgery.    There was no evidence of
     pseudoarthrosis or instability or evidence of nerve
     compression.

14.  Report from Gary Y. Okamura, orthopedic surgeon, May 4, 2000.
     He asked Dr. Okamura who insisted repeatedly he was not a
     spine surgeon and rather he should go to a pain management
     doctor.  Nevertheless, Mr. Backman asked if he could be seen
     only every one to two months and be given painkillers to last
     through that time.  Mr. Backman did not seem to understand
     this.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:     BACKMAN, Daniel
November 29, 2005
PAGE 25

**RECORD REVIEW:(Cont'd)**

**DEPOSITION OF LYNN MARTIN FOR RECORDS:**

1.  Evaluation note from Frank Izuta, June 23, 2000. Under subjective includes that when he returned to work in January 2000 he began getting harassed by his supervisor who began requiring lengthy reports which he states caused him stress and anxiety. On January 31, 2000 he blacked out when delivering videotape and damaged them and was admitted to the hospital for possible heart attack. Chest pain was attributed to anxiety. He reports he has significant problems with anxiety as this case has progressed. He repeatedly stated he was the best investigator in the company. He said he has competed in martial arts competition and said in regard to his family that his mother is a descendant of a Buddhist monk. His history predates Christ and his father is a descendant of Vikings. Under medical problems includes high levels of anxiety. Medications are OxyContin 80 mg three times a day and Xanax up to 4 mg a day as well as Neurontin. Imaging studies were reviewed; the diagnosis was cervical degenerative disk. Physical examination was completed on June 30, 2000.

2.  Progress note from Dr. Izuta, July 14, 2000. History notes it was difficult to keep Mr. Backman focused. He reports he has facial edema and extremity edema, not evident on exam.

    The content and direction of his thoughts are changing constantly. He reported he was being followed at work and that Dr. Chow's report was not the same as what he told him verbally.

3.  Report from Dr. Izuta, July 31st, 2000, which states that "secondary gain issues are definitely affecting this case."

**DEPOSITION OF MICHELLE PUA NAVARES REGARDING RECORDS:**

1.  Emergency department report from St. Frances Medical Center, April 12, 2000. The report states the patient is asking for 600 mg of Demerol, which he has had in the past. The note states he is unhappy that he did not get Demerol. On examination, blood pressure is 138/56, pulse rate is 115. The

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 26

**RECORD REVIEW:(Cont'd)**

     report states after some discussion, the EMS was contacted as he was very drowsy. He had taken some Soma and Xanax at home for pain. He was very drowsy and his family became very concerned about him. I am concerned the patient may have respiratory depression. He became very upset although did take oral pain medication. He continued to request 600 mg of Demerol, which he said he has required in the past and not even gotten pain relief of that medication. He said he had an enzyme in his blood that eats up all pain medication and he needs extremely large doses. The patient became very upset and continued to demand Demerol.

2.    Emergency department report stating 42-year-old said police confiscated some of his OxyContin and he also lost some of it. He complains of chronic neck pain. A nursing note states that he was screaming in the room and demanding IV pain medications and to see a physician.

**DEPOSITION OF KALEPONI SPENCER REGARDING RECORDS:**

1.    A writing report involving October 1988 accident stating that he thought he had lost consciousness, then initially had headache and dizziness. Note mentions developed GI problems with NSAIDs. He said injections helped but gradually became less effective. The history involving the case is summarized.

2.    Report from Peter E. Diamond, M.D., March 8th, 1999. Mr. Backman related there was a permanent impairment rating for his injury in 1992 or 1993, although he was still having symptoms that were tolerable. Around July of 1997, he noted dramatic change in his neck pain. There was mention of a personality conflict with one physician. An EMG was said not to show any significant interval changes. He was said to have problems with Ultram, Tylenol with codeine, and Percocet. He had a conflict with another physician. Current complaints were neck pain radiating into the left arm as well as numbness. History includes hyperlipidemia and high blood pressure. Dr. Diamond notes that in October of 1988, the accident produced a mild but central disk protrusion at C4-5 which became worse quite suddenly according to the patient in

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 27

**RECORD REVIEW:(Cont'd)**

> 1997 without any specific antecedent trauma but "most likely
> related to physical demands at work.  There was no one
> particular incident.  The report states, however, it is clear
> anyway that the incidents in 1997 produced a significant
> increase in the patient's symptoms.  In regard to treatment,
> the report mentions concerns regarding surgical treatment as
> the symptoms are not terribly consistent with the C4-5 disk
> injury.  Also, he has a well-established chronic pain syndrome
> and he has been taking OxyContin for an extended period of
> time.

3.   Letter from Dr. Diamond stating that although there has been
     a selection of a C4-5 procedure made, this being the request
     for a C4-5 micro-foraminotomy, I would note abnormalities on
     the cervical MRI at the C3-4 level.  The patient's clinical
     picture does not clearly indicate any one particular level as
     the source of his pain.

**DEPOSITION OF LAUREEN KONG REGARDING RECORDS:**

No additional records in this section.

**DEPOSITION OF BRENDA KALILIKANE REGARDING RECORDS:**

1.   Report from Terry G. Smith, Spine Surgery, February 8th, 1999,
     stating that her MRI scan shows a very large central disk
     herniation at the cervical C4-5 level.  The pain overall seems
     to have progressively worsened over the last eleven years
     since the date of injury.  Recommendation is operative care.
     Diagnosis is disk herniation at C4-5.

2.   Report, December 9, 1998, from Dr. Smith.  States there have
     been complaints of numbness on the left greater than the right
     C7-8 distribution.  He had chiropractic treatment without
     improvement and nonsteroidals gave him GI upset.  Medical
     illnesses include hypertension, anxiety, increased
     cholesterol, and muscle spasm.  Assessment is disk herniation
     at C4-5.

3.   Operative report, March 9, 1999.  Postop diagnosis is central
     disk herniation at C4-5.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:      Edquon Lee, Attorney at Law
RE:        BACKMAN, Daniel
November 29, 2005
PAGE 28

**RECORD REVIEW:(Cont'd)**

4.   Emergency department report, July 16th, 2000, in which the
     patient states he has a long history of anxiety associated
     with chest pain occurring two to three times a week.   The
     episode today occurred when he was washing the car.   Risk
     factors include hypertension, hyperlipidemia, and a positive
     family history for coronary artery disease.   He stated he
     remained anxious all day and had not eaten.   Medications
     include OxyContin, alprazolam, Neurontin, Norvasc, Lopid, and
     ibuprofen.    Blood pressure is 132/87.    The diagnostic
     impression is chest pain.   The patient was discharged.
     Electrocardiogram was normal.

5.   CT scan of the abdomen, September 19th, 2000.   Impression is
     likely pancreatitis changes.

**DEPOSITION OF BRENDA KALILIKANE REGARDING RECORDS:**

Records regarding admission for pancreatitis.

**DEPOSITION OF JON M. STRELTZER REGARDING RECORDS:**

1.   Report from Jon M. Streltzer, April 14th, 2003.   This reviewed
     records which had been reviewed above including a review of
     the MRI of June 6th, 2001, by Dr. Holmes, who found no
     abnormalities post surgery and definitely no C4-5 stenosis.
     Also, the note of November 19, 2001, indicating the methadone
     dose was 10 mg at bedtime.   Also records from the Department
     of the Medical Examiner noting that relationship with his
     family was strained since his conviction for abuse of a
     household member in July of 2001.   The report states he was
     hoping to lessen his dependence on pain medication.   On the
     night of January 1st, he slept in the master bedroom with his
     eight-year-old daughter.   At about 11:00 a.m. the next morning
     the daughter noticed her father could not be awakened.   There
     were mediation bottles on the chest and at the foot of the
     bed, some of which were empty.   There was no suicide note.
     The wife indicated that the decedent was trying to decrease
     his dependence on pain medication.   He had talked about
     wanting to be dead but did not want to miss seeing his
     daughters grow up.   Medication bottles included alprazolam 2

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 29

**RECORD REVIEW:(Cont'd)**

mg, 50 were prescribed and none were left, methadone 10 mg, prescribed on December 19th, 21 were left out of 90, and also in the bottle were 38 OxyContin 80-mg tablets and 6 OxyContin 40-mg tablets. Effexor was prescribed on November 13th, #90, and there were none left. Postmortem toxicology revealed a high level of oxycodone and a fatal level of methadone, also a toxic level of alprazolam.

Conclusions of the report state records reveal little information about Mr. Backman's history prior to 1988. Substance use history is unknown. He apparently suffered a minor motor vehicle accident in 1988. He was treated with chiropractic treatment. In 1990, there was concern about Valium use. Although some reviewers considered imaging studies to be relatively benign, nevertheless, Mr. Backman had surgery in March of 1999. Previous to this his narcotic dose had increased to OxyContin 20 mg twice a day. Postoperatively, Dr. Razzuk became concerned about continuing use of narcotics and benzodiazepines. Dr. Lind took over prescribing medications for pain in doses that only increased. In April of 2000, he was seen in the emergency room because he had become too drowsy. There was concern about an overdose. He said he had a great tolerance to narcotics and history is consistent with his significant narcotic dependence at that time. In July of 2000, he was taking OxyContin 80 mg three times a day, which is the equivalent of 48 Percocet pills a day, an extremely high dose. He was also on a high dose of Xanax. His behavior was influenced by these medications, which were intoxicating. In the beginning of 2000, he stopped being able to work. He had difficulty performing satisfactorily. This is a likely scenario for someone under the influence of high doses of narcotics and benzodiazepines on a regular basis. He was then prescribed OxyContin 160 mg three times a day, which was the equivalent of 96 Percocet pills, an amazingly high dose, also a very high dose of Xanax. He was also taking Soma. Dr. Otaka prescribed methadone near the end of 2001, apparently planning to detoxify the patient. OxyContin was continued, however. Normally when methadone is used to detoxify a patient, all other narcotics must be discontinued. In 2001, Mr. Backman became poorly able to

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 30

**RECORD REVIEW:(Cont'd)**

function.  Extrapolating from the medication bottles, he was
averaging about 60 mg methadone per day at the time of the
last prescription, although Dr. Otaka indicated the dose was
to be 10 mg and then increase to 20 mg.  The report states it
is likely Mr. Backman may have been taking more than 60 mg per
day in the last few days of his life.  Figures were consistent
with what is generally found in methadone deaths.  There were
also high levels of oxycodone and extremely high levels of
benzodiazepine.  All circumstances indicated an accidental
death due to overdose of these medications.

Under diagnosis, the report states the most obvious is that of
opioid dependence that has been present for at least three
years and possibly longer.  Mr. Backman was manipulative
regarding narcotics.  He was seen in the emergency room with
symptoms likely due to narcotic withdrawal when he presented
with abdominal symptoms.  Despite physician's intentions to
reduce doses, the patient managed to get them subtly increased
and simultaneously his function deteriorated and his pain
complaints escalated.  This is consistent with the diagnosis
of severe opioid dependence.  In related fashion, there was a
diagnosis of benzodiazepine dependence.  The third likely
diagnosis is somatoform pain disorder.  Since at least 1998
and possibly before that, the pain complaints were
inconsistent with objective medical findings and were grossly
disproportionate.  These complaints increase as his dependence
on narcotics increased.  Somatoform pain disorder is primarily
psychologically based that can lead to failed surgical
attempts.  Methadone is an excellent pain medication.  It is
also used to detoxify someone with narcotic dependence because
it is long-acting drug which allows tapering without
instituting withdrawal symptoms.  It is very powerful and has
been associated with deaths in certain situation.  It is not
a medication that can be taken on an as-needed basis.  Mr.
Backman was noncompliant with his prescriptions taking them as
he felt like and often in much greater doses than physicians
prescribed.  In addition, benzodiazepines greatly increase the
likelihood of deaths with methadone.  Mr. Backman felt he had
a high tolerance and could handle very large doses of
narcotics.  This contributed to his escalating dose and
ultimately his death.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:    Edquon Lee, Attorney at Law
RE:    BACKMAN, Daniel
November 29, 2005
PAGE 31

**RECORD REVIEW:(Cont'd)**

Additional records were reviewed. This indicates that Mr. Backman was taking regular narcotics and Xanax from 1999. In 2001, he was averaging 10 mg of Xanax per day, an extremely high dose. Conclusions state records document narcotic dependence was well established in 1999 but degree of narcotic dependence escalated dramatically subsequently. He was using amazingly high levels of dangerous medications in the year 2000. His function is consistent with narcotic dependence. It is highly unlikely this type of functioning would be associated with a neck injury if not for narcotic dependence.

2.    Investigation of death, January 2nd, 2002.

**DISCUSSION:**

Mr. Backman was described as having a minor injury to his neck in 1988 which was treated nonsurgically. He then claimed that due to stress and physical activities, that after many years he had a sudden worsening of neck pain which was attributed to disk disease at C4-5. Some orthopedic physicians have indicated indications for that surgery was somewhat tenuous. Following the surgery, he did not improve for more than a few months before complaining of worsening neck pain. He had undergone a cervical fusion procedure at C4-5 in March of 1999.

By July of 1999, Mr. Backman was being prescribed potent narcotics in the form of Percocet and then by July, although records note that disk herniation was improved, was being prescribed OxyContin and Xanax, a benzodiazepine sedative. Increasing doses of potent narcotic analgesics along with large doses of sedative medications were prescribed. The progress note of April 11, 2000 noted that Mr. Backman was relying too much on pain medication to get by. There was great concern about his escalating dosage and dependence and tolerance. Two days later he was admitted by ambulance to the hospital when he could not be aroused and there was concern that he was overdosed. It was found that all of his narcotic medications were gone.

Records indicate that although complaining of severe pain, there was no objective pathology that would account for such discomfort

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:      Edquon Lee, Attorney at Law
RE:        BACKMAN, Daniel
November 29, 2005
PAGE 32

**DISCUSSION:(Cont'd)**

and also the dermatomal patterns were incorrect for a C4-5 disk
disease. A note of April 2000 by his treating physician noted that
there was a danger because Mr. Backman was using narcotic
medication to solve his emotional problems. His wife had become
upset with him and doubted his credibility in regard to the amount
of discomfort of which he was complaining. There were problems
with Mr. Backman's parents. Mr. Backman's father, concerned that
he was suicidal in May of 2001, said he was taking too much
medication. He exhibited drug-seeking behavior complaining of lost
prescriptions and going to the emergency room asking for narcotic
prescriptions and injections, in particular extraordinarily high
doses of Demerol, to which he said he had become accustomed.

Although complaining of chronic pain and being upset that his
second surgery was not being approved, according to the report from
Dr. Holmes who reviewed imaging studies, he stated there were no
specific changes at C4-5 to suggest a need for surgery and rather
diagnosed mild diffuse degenerative disk disease and that the bone
fusion at C4-5 was solid. Dr. Yuh also interpreted the MRIs
finding no significant central canal stenosis or foraminal
narrowing. Dr. Diamond when evaluating for surgery questioned that
surgery would not solve his symptoms, which were not consistent at
any rate with his C4-5 radiculopathy. Although a report stated
that Dr. Holmes did not review x-ray films of the cervical spine
and therefore his opinion was based on incomplete medical records,
this is incorrect as the MRI examination would be a far more
accurate interpretation for disk disease than a cervical spine x-
ray. Dr. Graham actually had recommended Dr. Holmes to review the
MRI scan after he had disagreed with the interpretation.

By 2001, Mr. Backman was having further problems with his wife and
marriage. His wife had asked for a divorce. There had been
further drug-seeking behavior such as previously stated in the
report from Dr. Okamura in May of 2000.

Dr. Chow when evaluating Mr. Backman found there was no need for
any further surgery and mentioned there was no good solution to his
problem. There was no evidence of any abnormality that would
require surgery. There was no evidence of any nerve compression
and no evidence of instability. It was noted that he was seeing
the psychiatrist and Dr. Chow mentioned that this was wise.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 33

**DISCUSSION:(Cont'd)**

In spite of the lack of any distinct pathology as a cause for complaints of pain, Mr. Backman continued to be prescribed large doses of the most potent narcotic analgesics. The initiating dose for OxyContin in opioid naïve patients is only 10 mg every 12 hours.  80 mg or higher are only to be used in opioid tolerant patients.  The highest dose tablet is 80 mg.  By February of 2001, Mr. Backman was being prescribed 180 mg three times a day.  By November of 2001, he was being weaned off OxyContin and was placed on methadone at first 10 and then 20 mg a day.  When he died he was supposed to be on a dose of OxyContin 80 mg twice a day and methadone 10 mg three times a day.  He was also taking benzodiazepines.  He had been taking large doses of Valium as far back as 1990, at which time he was taking 40 mg a day.

Associated with taking large doses of narcotics and benzodiazepines for which there was no clear indication, Mr. Backman's behavior not only in regard to drug-seeking became more intense but also his personal relationships.  He became violent and was arrested in August of 2001 for beating his wife.  As his drugs were confiscated, he returned to physicians asking for more narcotics. He had been off work since January of 2000.  He was using narcotics inappropriately and not as prescribed.  There had been evidence that he had been overdosing.  He had been found asleep on the toilet in August of 2000.  His narcotic abuse had reached the point where at the beginning of 2000 he was unable to work and could not keep with his boss' demands.

According to the amount of methadone medication remaining, it appeared that Mr. Backman was taking about 60 mg of methadone per day prior to his death in addition to large doses of other narcotics and benzodiazepines.  As noted in his request for a dose of 600 mg of Demerol, Mr. Backman believed that he had an enormous tolerance to drugs, describing his body as one that metabolized the drugs to a greater degree than other individuals and therefore he needed supernormal doses.  As noted in the report from Dr. Streltzer, he believed Mr. Backman was noncompliant with his prescriptions and took them the way he felt and at much greater doses than the physicians prescribed.

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:    Edquon Lee, Attorney at Law
RE:      BACKMAN, Daniel
November 29, 2005
PAGE 34

**DISCUSSION:(Cont'd)**

Methadone is a long acting opioid agonist. Methadone even at therapeutic doses can produce central sleep apnea, that is, a lack of breathing.

**Reference:    Wang D., Central Sleep Apnea and Stable Methadone Maintenance Treatment Patients, Chest-01-Sep-2005;128(3):1348-56.**

Drug-seeking patients include addicts whose dependence occurred through abuse. Opioids produce euphoria in some patient providing the motivation for abuse, which can be detrimental even with occasional use. Even in the absence of overt euphoria, opioids are highly self-reinforcing and can be problematic in a large number of patients. For patients including chronic pain patients, withholding opioids may be an important part of the long-term management.

**Reference:    Hansen G. R., Emergency Medicine Clinics of North America, 01-May-2005;23(2):349-365.**

All-cause mortality rate in methadone maintenance treatment patients is three to four times above that of the normal population. Half of the deaths occur after the patients have stabilized on methadone. In the majority of these deaths, the cause is unknown. These opioids depress respiration in part by direct effect on brainstem respiratory centers. Acute opioid use significantly reduces the ventilatory responsiveness to carbon dioxide and hypoxia. In studying opiate use and over-dosage, it was noted that 80% reported the use of cointoxicants including central nervous system depressants. (These would include benzodiazepines such as Mr. Backman was taking in large amounts).

**Reference: Wadland W. and Ferenchick G., Medical Comorbidity and Addictive Disorders, Psychiatric Clinics of North America, Volume 27, #4, December 2004.**

Side-effects such as sedation and respiratory depression are increased when methadone is combined with other drugs. An Australian study found benzodiazepines present in 74% of deaths related to methadone and noted to have particular caution when methadone was prescribed with benzodiazepines. **In regard to methadone, contrary to expectations, toxicity occurs more frequently in patients previously exposed to high doses of opioids.**

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:    Edquon Lee, Attorney at Law
RE:      BACKMAN, Daniel
November 29, 2005
PAGE 35

**DISCUSSION:(Cont'd)**

Systemic toxicity for methadone including respiratory depression
and death can result from relying on analgesic-equivalent tables
for chronic dosing because such reliance can result in a
substantial overdose that may not be apparent for several days.
The drug has a long half-life as compared to morphine.

**Reference: Toombs J. and Pajrm L., Methadone Treatment for Pain
States American Family Physician, Volume 71, #7, April 1, 2005.**

Addiction to opioids as compared to tolerance for true pain has
genetic, psychosocial and environmental factors influencing its
development and manifestation.  Addiction is characterized by drug-
cravings, lack of control and/or compulsive drug use, and continued
use despite the realization of potential and actual harm.  With
addiction, there is a resultant decrease in the quality of life.
Addiction is a maladaptive behavioral pattern in which opioids are
taken for the mental and psychic effects rather than their pain-
relieving properties.   Individuals addicted to opioids in whom
withdrawal is occurring can engage in destructive behaviors.

Mr. Backman would continue to complain to his physicians of chronic
pain.  He was taking very large doses of narcotics and
benzodiazepines, that is sedatives, believing that he had an
extraordinary tolerance.  There was no medical condition to account
for the need for such drugs, which, according to the history, were
never effective in completely relieving the pain of which Mr.
Backman complained, the pain that was doubted to be sincere by his
wife and father and which had already led to physical and social
consequences.  I quite agree with Dr. Streltzer and the coroner's
report that Mr. Backman died of an accidental overdose for which
there is clear objective data in the coroner's report regarding
drug levels that were considered fatal for methadone, and which in
conjunction with other drug abuse led to Mr. Backman's accidental
death.  He was not taking medications to relieve any industrially-
related pain condition but was abusing narcotics and
benzodiazepines to the point he accidentally took an over-dosage
resulting in his death.

Mr. Backman had significant risk factors for coronary artery
disease. He was found to have evidence of occlusive disease on

Lyons, Brandt, Cook & Hiramatsu/Attorneys at Law
ATTN:     Edquon Lee, Attorney at Law
RE:       BACKMAN, Daniel
November 29, 2005
PAGE 36

**DISCUSSION:(Cont'd)**

autopsy. He did have a stress test done in 2000 which was negative and it is not probable that this had advanced to the point where it had caused his death. The autopsy findings noted congestive changes in the organs that were not considered to be the primary cause of death.

Mr. Backman's story is not that of an individual who had an industrial injury requiring medications that would have contributed to his death but rather Mr. Backman's history is that of abusing narcotic and benzodiazepine medications to an extraordinary degree, and for no defined medical purpose, to the point where he accidentally took such a large dose of a long-acting as well as a shorter-acting narcotic medication that combined with benzodiazepines, that is sedatives and sleeping medications, led to an accidental over-dosage death related to respiratory depression.

Sincerely,

_Signature of Physician_

**AJIT S. ARORA, M.D., Ph.D.**
**American Board Diplomate in**
**Internal Medicine and Forensic Medicine**
**Qualified for Medical Toxicology Subboard: ABEM**
**Qualified Medical Examiner**

ASA:MG:abs

**CURRICULUM VITAE**
**AJIT S. ARORA, M.D., Ph.D.**

## PERSONAL DATA:

Date of Birth:                January 1942
Place of Birth:         India
Citizenship:            USA
Marital Status:         Married
Hobbies:                Music
Health:                 Fair

## DEGREES:

1981            Medical Degree (MD), University of California, San
                Francisco School of Medicine, Honors.

January 1976    Ph.D., Organic Chemistry, University of Southern
                California, Graduate Research: Asymmetric Synthesis,
                GPA=4.0

India, 1965     M.Sc., Organic Chemistry, University of Lucknow,
                Number One in Graduating Class, Gold Medal
                Recipient.

India, 1961     B.Sc., Chemistry, Zoology, Botany. Agra University,
                Number One in class of 4000.

## PROFESSIONAL LICENSES, CERTIFICATIONS, AND BOARDS:

State of California -  G 047654
State of Hawaii - MD8852
State of Alaska - 3745

Diplomate American Board of Internal Medicine -
September 1984-Present

Diplomate American Board of Geriatric Medicine -
April 1988-1998

**PROFESSIONAL LICENSES, CERTIFICATIONS, AND BOARDS: (Cont'd)**

Diplomate of the American Board of Forensic Medicine
December 1996-Present

Diplomate of American Board of Forensic Examiners
March 13, 1996-Present

Fellow American College of Forensic Examiners
February 8, 1996

Independent Medical Examiner
Department of Industrial Accidents, San Francisco

Independent Medical Examiner
U.S. Department of Labor, San Francisco

QME, Qualified Medical Evaluator
Department of Industrial Council, San Francisco

Board Qualified Medical Toxicology through American Board of
Emergency Medicine.

**ACADEMIC AND TEACHING ACTIVITIES:**

| | |
|---|---|
| 1990 - 2002 | Clinical Faculty UCLA School of Medicine, Assistant Clinical Professor of Medicine. 1990-2002 |
| 1986 - Present | Attending Physician, Northridge Hospital Medical Center, Family Practice Residency Program. |
| | Preceptor, USC Physician Assistant Program, U.C. Davis Nurse Practitioner Program. |
| 1976 - 1977 | Assistant Prof. Chemistry, Cal. Poly State University, San Luis Obispo. |

Curriculum Vitae
Ajit S. Arora, M.d., Ph.D.
Page 3

| | |
|---|---|
| 1974 - 1977 | Postdoctoral Research Associate, Sulphur Chemistry and Biochemistry, Molecular Toxicology of Alcohol, University of Southern California, School of Pharmacy/Cancer Center. |
| 1973 - 1974 | Research Assistant, Synthesis of Chiral Amines, Structure-Reactivity Relationship Technische Universitat, Munich, West Germany. |

## ACADEMIC AND TEACHING ACTIVITIES: (Cont'd)

| | |
|---|---|
| 1974 - 1977 | Research Consultant, Development of Diagnostic Procedures. General Medical Company, Los Angeles, CA.  Work |

Patented.

| | |
|---|---|
| 1988 - Present | Lecture Series in Occupational Medicine for Community and Professionals, Education.  Topics covered to date include the following: |

- Occupational Pulmonary Disease.  Pulmonary Toxicology
- Stress, Hypertension and Heart Disease.
- Asbestos Related Occupational Diseases
- Occupational Disease, Toxic Exposure
- Valley Fever
- Stress & Systemic Disease
- Medical Causation in Occupational Disease Proper Science vs. Common Science

C     21st Century Enigmas - Fibromyalgia, Chronic Fatigue Syndrome, Multiple Chemical Sensitivity Syndrome

| | |
|---|---|
| 1976 - 1977 | Research Consultant, Analysis and Formulation of Toners, Black Copy Company, Canoga Park, California. |
| Jan. 1976 - 1977 | Research Consultant, Environmental Toxins, Water Analysis, Liquid Crystals. Ensotech Incorporated, Los Angeles, California. |
| Mar. 1974 - Sept. 1974 | Research Consultant, Prostaglandin Synthesis, Intra-Science Research Foundation. |
| Mar. 1974 - Jan. 1975 | Research Consultant, Synthesis of Nicotinamide, Thiacetazone, Utilization of Heavy Bases, Chemo- |

Curriculum Vitae
Ajit S. Arora, M.d., Ph.D.
Page 4

                        Pharma Private Ltd., Bombay, India.

1971 - 1973             Technical Specialist, Technology Intelligence,
University of Southern California.
Western Research Application Center.

Curriculum Vitae
Ajit S. Arora, M.d., Ph.D.
Page 5


| 1971 - 1972 | Research Assistant with M. P. Sambhi, M.D., U.S.C. School of Medicine. Renin - Angiotensin System and Hypertension. |
| 1965 - 1969 | Lecturer in Chemistry, Khalsa Collage, University of Bombay, Bombay, India. |
| 2004 | Mold Toxicity in Indoor Environment |

## PROFESSIONAL EXPERIENCE:

**Occupational Medicine:**

| 1984 - Present | Treating Injured Workers' Comprehensive Medical Evaluations of Occupational Injuries in the areas of Toxicology, Stress and Illness, and Metabolic Disease. Agreed Medical Examinations in the filed of Toxicology. |

**Clinical Medicine:**

| July 1984 - Present | Private Practice, Internal Medicine, Geriatrics. |
| 1982 - 1986 | Independent Contractor / Physician, Hawthorne Community Medical Group, Hospital Coverage and Clinics |
| 1982 - 1986 | Emergency Room Physician, Olive View Medical Center, 7555 Van Nuys Blvd., Van Nuys, CA, 91409. |
| Jul. 1984 - 1986 | Physician Specialist, Olive View Medical Center, Out Patient Clinic 7555 Van Nuys Blvd., Van Nuys, CA, 91409. |
| June 1982 - 1984 | Internal Medicine, Residency, Wadsworth V.A. Medical Center / UCLA |
| | Post Graduate Research with Neil Kaplovitz, M.D., Professor of Medicine, UCLA School of Medicine - Molecular Mechanism of Action of Alcohol Dehydrogenase, Liver Toxicology 1982. |

Curriculum Vitae
Ajit S. Arora, M.d., Ph.D.
Page 6


June 1981 - 1982          Internal Medicine Internship, Wadsworth V.A.
                          Medical Center / UCLA

## HONORS and AWARDS:

Member Occupational Medicine
Delegation of North America to Mainland China
October-November 1994, Delegation Leader Dr.
Tee Guittodi University of Alberta Canada

1975, Sigma Xi -
Honor Society in Science.

Best Organic Chemistry Teacher in India - 1968,
Award by U. S. Educational Foundation in India.

Fullbright Scholarship in Chemistry For Studies in
United States, 1969.

Merit Scholar, Lucknow University, India, 1963 -
1965.

Gold Medal, Lucknow University, India, 1965.

## MEMBERSHIPS:

American Medical Association
American Chemical Society
California Medical Association
Consulting Chemists Association
Los Angeles County Medical Association
Interscience Research Foundation
National Geographic Society
Smithsonian Institute

## PROFESSIONAL MEMBERSHIPS:

Health Care Compare Affordable
Admar Corporation IPA
Metlife Network
Apple Healthcare
Careamerica
Primary Care Physician (PCP)

Curriculum Vitae
Ajit S. Arora, M.d., Ph.D.
Page 7

Community Care Network (CCN)

Testimony over Last Five Years

For

Ajit S. Arora, M.D., PhD

| | |
|---|---|
| McAvinue, Rhonda | 1/19/1999 |
| Lucero, Epefanio | 6/15/2000 |
| Williams, Shirley  -vs- Tesoro Company | 11/28/2000 |
| Briody, Philomena -vs- H.C. Price | 12/14/2000 |
| Cottrell, Keith -vs- Chevron U.S.A | 3/7/2002 |
| Corpuz, Merlina -vs- Patrick Ohara , DDS | 7/31/2002 |
| Young, Olga -vs- County of Maui | 4/1/2003 |
| Delara, George -vs- Maui Pineapple Company, LTD | 5/27/2003 |
| Taira, Andrew -vs- Kapalila Land Company | 2/9/2005 |