Of Counsel:
KAWAMURA LAW OFFICE
Attorneys at Law

ROBERT D. KAWAMURA 4537-0
107 Lawyers Building
550 Halekauwila Street
Honolulu, Hawai'i  96813
Telephone: (808) 523-3777
Facsimile: (808) 523-3780
Email:   honolaw@aol.com

Attorney for Plaintiff
JULIA  M. BACKMAN, individually and on
Behalf of the ESTATE OF DANIEL VERNON BACKMAN,
Deceased, and as Next Friend to KELLY KEIKO
VALENE BACKMAN and JODI LEIGH YACHIYO BACKMAN,
Minors

             IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| JULIA  M. BACKMAN, individually and on Behalf of the ESTATE OF DANIEL VERNON BACKMAN, and as Next Friend to KELLY KEIKO VALENE BACKMAN and JODI LEIGH YACHIYO BACKMAN, Minors, | ) ) ) ) ) ) ) ) | Civil No. 04-00348 (HG KSC) (Contract)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT RSKCO SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT FILED FEBRUARY 15, 2006** |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| RSKCO SERVICES, INC., a Illinois corporation; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE LIMITED LIABILITY ENTITIES 1-10; DOE "NON-PROFIT" CORPORATIONS 1-10; and DOE GOVERNMENTAL ENTITIES 1-10, | ) ) ) ) ) ) ) ) ) ) ) | **Hearing**:<br>**Date:   March 29, 2006**<br>**Time:    9:30 a.m.**<br>**Judge:  Kevin S.C. Chang** |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT RSKCO SERVICES, INC.'S**
**MOTION FOR SUMMARY JUDGMENT FILED FEBRUARY 15, 2006**

I.  INTRODUCTION

This is a tragic wrongful death case.  Daniel Backman, a husband and father of two minor daughters (then ages 3 and 8), fought his worker's compensation carrier through its adjustment company (Defendant) for approximately twenty (20) months to gain approval of his neck surgery request to relieve severe neck pain caused by a failed 1999 fusion and to end the need for high doses of narcotic pain medication.

Defendant failed to deny the January 16, 2001 request within the seven day period required time under Hawaii worker's compensation law[1].  Under the law, failure to deny the surgery request "shall constitute approval of the request."  See Rule 12-15-51(b) HAR.  Unfortunately, despite Daniel Backman's surgery request being approved as a matter of law, Defendant continued to deny the request for nine months until forced to pay for the surgery by decision of the Labor Board dated October 29, 2001.  In seeking support for its denial of benefits, Defendant submitted only selected records to two (2) independent medical examiners, Peter E. Diamond, M.D. and Stephen Holmes, M.D., in the hopes that they would recommend denying the request; Defendant withheld critical X-rays and other records

---

[1] See Pg 2, Findings of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".

2

which supported the surgery request from the examiners[2].   The
withheld X-rays from 1999 showed that the 1999 fusion had failed
and that there was incomplete incorporation of the bone plug to
the C4 and C5 vertebral bodes and that it may have migrated
slightly cranially[3].   The examiners could not opine whether the
surgery was necessary, as Defendant did not provide them with
complete medical records[4].   Despite the statutory approval and
the fact that none of these examiners opined that the surgery
was not indicated, Defendant still denied coverage five months
after the request, in a document that bears the date of June 22,
2001[5].   Defendant vigorously opposed the surgery in proceedings
before the Department of Labor and Industrial Relations,
Disability Compensation Division.   The Director of the Labor and
Industrial Relations ("the Director") ruled that Defendant was
liable for Mr. Backman's surgery, citing Defendant's conduct of
(1) ignoring the statutory deadline within which it could have
denied the request; and (2) withholding important medical
records from the hired examiners[6].   During the months that
Defendant refused to accept that the surgery had been approved
as a matter of law, Mr. Backman's pain medication needs
substantially increased due to chronic, severe, unbearable and

---

[2] See Pgs. 2-3, Findings of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".
[3] See Pg. 2, Findings of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".
[4] See Pg. 2-3, Finding of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".
[5] See Pg 2, Findings of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".
[6] See Pgs. 2-4, Findings of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".

unmanageable neck pain. Mr. Backman developed a prescription narcotic dependency and even suffered pancreatitis attributable to the adverse effects from his medications[7]. In fact, Defendant paid for treatment of Mr. Backman's chronic pain and pancreatitis,[8] but not for the surgery that would resolve these problems. After the favorable Director's decision, Mr. Backman was being weaned off of the medication to prepare him for the surgery[9]. Mr. Backman "hoped that the additional surgery would relieve his chronic pain and allow him to discontinue taking medication."[10]    Tragically, after finally winning the approval for his surgery, Mr. Backman suffered a toxic overdose from his pain medication and died on January 2, 2002[11]. The Director credited the autopsy findings that Mr. Backman died from accidental poisoning from the toxic effects of his medications, and found that the overdose was accidental[12]. The Director further found that "A causal relationship between the initial neck injury and his demise from toxic combination of prescription narcotic medications and other medications has been established."[13]    The Director also found that Mr. Backman's death

---

[7] See Pg. 2, Findings, of Fact, Department of Labor and Industrial Relations 06-25-2003 Decision, Ex. "2".
[8] See Pg. 2, Findings of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".
[9] See Pg. 2, Findings of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".
[10] See Pg. 2, Findings of Fact, Department of Labor and Industrial Relations 06-25-2003 Decision, Ex. "2".
[11] See Pg. 1, Findings of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".
[12] See Pgs. 1, 2 & 5, Findings of Fact, Department of Labor and Industrial Relations 06-25-2003 Decision, Ex. "2".
[13] See Pg. 5, Findings of Fact, Department of Labor and Industrial Relations 06-25-2003 Decision, Ex. "2".

was compensable[14]. These facts are not in dispute and these findings of the Director are law of the case. At the very least, they create genuine issues of material fact that are fatal to this motion.

The defendant RSKO is an insurance adjusting company, to whom Daniel Backman and his attending physician, John Graham, M.D., presented a formal written request for approval of surgery pursuant to a workers' compensation claim. The request was made on January 16, 2001. Defendant issued a denial of said request on June 22, 2001.

Hawaii Administrative Rules § 12-15-51 provides that any request not denied within seven days "shall constitute approval of the request." It is undisputed that Defendant did not deny the request within that period. Therefore, from and after January 24, 2001, Defendant was required to approve such surgery as a matter of law. Despite this statutory approval, Defendant was intent on denying the surgery request and continued to do so for nine (9) months until the Director's October 29, 2001 Decision, finding that Defendant was responsible for the payment of Mr. Backman's surgery. Tragically, despite Mr. Backman being weaned off of his medications following this Decision, he suffered a toxic

---

[14] See Pg. 5, Findings of Fact, Department of Labor and Industrial Relations 06-25-2003 Decision, Ex . "2".

overdose from his pain medications on January 2, 2002 and died waiting for his surgery.

None of the above can be disputed.  The Findings and Conclusions of Law contained in the Director's 10-29-2001 and 06-20-2003 Decisions are law of the case and its findings and conclusions are incorporated herein by reference and are attached hereto as exhibits.

Summary judgment is properly granted when there are no genuine issues of material fact as determined by a trier of fact.  The above established facts, would only entitle the Plaintiffs, not the Defendant, to (partial) summary judgment, which has not yet been requested.

Likewise, there are genuine issues of material fact as to whether punitive damages are warranted in this case because of Defendant's established willful, oppressive and malicious conduct that was designed to accomplish a predetermined outcome of denying the surgery request.  The inexcusable and damaging delay in approving the surgery, causing Daniel Backman to suffer nearly a full year of daily, unbearable and unmanageable pain, as well as his death, and Defendant's deliberate attempt to misinform its hired examiners, may well warrant the imposition of punitive damages.  In view of the statutory approval, the examiners' opinions were not relevant to Defendant's liability, but it is important to note that even with key records withheld

from the examiners, including none of the critically important X-rays, the independent examiners did not agree that surgery was not needed.

Defendant further claims that Plaintiffs must provide the testimony of an "expert" insurance adjuster to establish the "standard of care" that Defendant must use in performing its duties. That is not the case here. The standard of care is established by Section 12-15-51 HAR. No expert is needed to establish that Defendant failed to comply with this standard as there was a statutory approval in place. Similarly, no expert is necessary to show that Defendant's withholding of key records from the examiners, as well as misdirecting the inquiry they were to make, is not within the standard of care, especially as the referrals to the experts were made months after the statutory approval. Furthermore, the failure to properly mail the ultimate denial to Mr. Backman, so that he would appear to have inadequate time to oppose it, breached any reasonable standard of care.

Lastly, Defendant contends that this suit is barred by the statute of limitations. Since none of the individual Plaintiffs would have had a cause of action for damages until Daniel Backman's death, the limitations period could not have commenced until his untimely death of January 2, 2002. Morever, up until his death, Mr. Backman was fighting his claim under the

worker's compensation claim system.  Finally, the statute of limitations has clearly not run on the claims of Daniel Backman's minor children, Plaintiffs Kelly Keiko Valene Backman and Jodi Leigh Yachiyo Backman.

II.  ARGUMENT

    1.  Plaintiffs Have Causes Of Action Against Defendant.

       In *Best Place, Inc. v. Penn American Insurance Co.*, 82 Hawai'i 120, 920 P.2d 334 (1996), the Hawaii Supreme Court recognized a cause of action based on violation of the duty of good faith in insurance contracts. It held "that there is a legal duty, implied in a first and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action." *Best Place*, 82 Hawai'i at 132, 920 P.2d at 346.  In *Hough v. Pac. Ins.*, 83 Haw. 457 (1996), the Court stated:

> "Although our rulings in *Best Place* were directed toward the rights of the insured and not those of claimants, an employee is not merely a potential claimant in relation to his or her employer's workers' compensation insurance contract. An employee is an intended third-party beneficiary[15] of an employer's contract with an insurance company for workers' compensation coverage.
>
> The Workers' Compensation Act sets forth a compensation scheme that is based on a three-party agreement entered into by the employer, the employee, and the compensation carrier. . . . As between the compensation carrier and the employee, there is a promise for a promise: the carrier agrees to

8

compensate the employee for injuries sustained in the course of employment, and the employee agrees to relinquish his common law rights against his employer. The employee is thus a party to the contract and therefore entitled to recover in that capacity.

*Aranda*, 748 S.W.2d at 212 (citations omitted.); *Franks v. United States Fidelity and Guar. Co.*, 718 P.2d 193, 197 (Ariz. Ct. App. 1985) ("A claim by an injured employee against the workers' compensation carrier is a first-party claim."). *See also Dawes v. First Ins. Co. of Hawai'i, Ltd.*, 77 Hawai'i 117, 128 n.12, 883 P.2d 38, 49 n.12 (recognizing non-contracting parties' rights as third party beneficiaries of an insurance contract), *reconsideration denied*, 77 Hawai'i 489, 889 P.2d 66 (1994) *Hunt v. First Ins. Co. of Hawai'i, Ltd.*, 82 Hawai'i 363, 367, 922 P.2d 976, 980 (App. 1996) (same), *cert. dismissed*, ___ Hawai'i ___, ___ P.2d ___ (Sept. 23, 1996).

Pacific, therefore, owed contractual duties, express and implied, to Hough, as an intended beneficiary of his employers' workers' compensation insurance contract. Accordingly, we hold that Hough may enforce these duties, *see Restatement (Second) of Contracts* §304 (1981), including the duty to handle and pay claims in good faith. Under the rationale articulated in *Best Place*, a breach of the implied contractual duty of good faith gives rise to the independent tort cause of action for a third-party beneficiary, under the same standards and with the same limitations for punitive damages as discussed in *Best Place*, 82 Hawai'i at 132-34, 920 P.2d at 346-48.

Consequently, summary judgment in favor of Pacific on Counts VI (breach of contract) and VIII ("bad faith") was improperly granted."

*Hough*, 83 Haw. at 468-469. Here, Defendant admits that it is the representative of the worker's compensation insurer for Daniel Backman's employer. (Memorandum at 12) Defendant admits that it has a "duty of absolute loyalty" to the insurer. Therefore, the defendant is the agent of the insurer and is held

to the same standard of care as the principal.    Restatement of
Agency § 347, 2d.

Moreover, Defendant disingenuously attempts to confuse
the duty of loyalty it owes to its principal with the
contractual duty of good faith which the principal, and
therefore its agent, owes to any person with whom it enters into
a contract. Daniel Backman and his heirs are the known and
intended third party beneficiaries of the workers compensation
insurance policy procured by the employer; defendant's
obligation is to carry out that policy in good faith. *Hough* at
468, citing its decision in *Best Place*.    Every contract contains
an implied covenant of good faith and fair dealing that neither
party will do anything that will deprive the other of benefits
of the agreement. *Best Place* at 124.    In discussing HRS §431:1-
102, the Hawaii Supreme Court stated "The business of insurance
is one affected by the public interest, requiring that *all
persons be actuated by good faith, abstain from deception and
practice honesty and equity in all insurance matters.*". . .
Court supplied italics, *ibid.* at 126.    "The obligation to deal
in good faith is now a well-established principle of contract
law." *Ibid.*, discussing the Restatement (Second) Contracts §
205.    There is therefore no conflict between the duty of loyalty
to the principal and the duty of all parties to a contract to

deal in good faith.   Defendant owed a duty to deal in good faith and failed to do so, causing Daniel Backman's death.   Defendant cites *Meineke v. GAB Business Services, Inc.,* 195 Ariz. 564, 991 P.2d 267 (2000).   In that case, the plaintiffs' claims were dismissed "as a sanction for appellants' repeated violations of court orders and the Arizona Rules of Civil Procedure."   *Ibid.* at 269.   The appellate court approved the trial court's ruling that there was no duty in this case.   Since many other Arizona cases have found such a duty,[15] *Meineke* may be an example of bad facts making bad law.

This reasoning was explicitly rejected by the Hawaii Supreme Court in *Best Place, supra.*   "The whole purpose of insurance is defeated if an insurance company can refuse or fail, without justification, to pay a valid claim.   We have determined that it is reasonable to conclude that there is a legal duty implied in an insurance contract that the insurance company must act in good faith in dealing with the insured on a claim, and a violation of that duty of good faith is a tort." quoting *Noble v. National American Life Ins. Co.,* 128 Ariz. 188, 189-90, 624 P.2d 866, 867-68 (1981).

The   *Best   Place*   Court   then   reviewed   cases   in jurisdictions where no such duty is recognized.   "We regard this

---

[15] *See Noble v. National American Life Ins. Co., cited above,* and subsequent line of Arizona cases relying thereon; and cases cited in N. Goldberg, T. Segalla, R. Cohen, *Can the Puzzle be Solved: Are Punitive Damages Awardable in New York for First-Party Bad Faith,* 44 Syracuse L.Rev. 723 (1993).

rationale as unpersuasive because it is premised on the assumption that tort liability in the third-party context is based solely on an agency theory and the resulting fiduciary obligations. The agency relationship, however, is not a condition precedent for imposing tort liability on insurers who fail to perform their obligations in good faith. Hawaii law imposes a duty of good faith and fair dealing in *all* contracts, not only those in which there is an agency relationship. Whether a breach of this duty will give rise to a cause of action in tort, then, depends upon the duty or duties inherent in a particular type of contract. In the insurance context, we believe that the fiduciary duty on the part of the insurer in the third-party context, albeit significant, is but one component of a broader duty to act in good faith and deal fairly with its insureds so as not to deprive the insured of the very benefits for which he or she has contracted." *Ibid.* at 129.

Defendant acknowledges that Daniel Backman was the intended third-party beneficiary of the contract. (Memorandum at p. 13). It is undisputed that his estate, wife and children are also third-party beneficiaries of the contract, and as beneficiaries entitled to benefits under the worker's compensation system. See §§ 386-34, 386-41 and 386-42 HRS. The Director found as a matter of law that Mr. Backman's wife, Plaintiff Julia Backman, and minor daughters, Kelly K.V. Backman

and Jodi L.Y. Backman, were each "dependents entitled to compensation under Section 386-41, 386-42, and 386-43, Hawaii Revised Statutes".[16]

Defendant confuses the contractual duty of good faith, to which intended third party beneficiaries should obviously benefit from, "so as not to deprive the insured of the very benefits for which he or she has contracted," with the tort of bad faith, and assumes that if tort remedies are available, contract remedies must not be. (Memorandum at 13).

The core of the Hawaii Supreme Court's decision in *Best Place* is that the tort of bad faith is distinguishable from a tortuous breach of contract action; it therefore follows that the tort is also distinguishable from any other action for breach of contract. The tort allows an insured to recover for bad faith misconduct, even if the insurer performs the express covenant to pay claims. Tort recovery for breach of the implied covenant of good faith is not rendered unnecessary because of the availability of a tort remedy in an action for breach of contract. The opposite would naturally also be true: breach of contract will lie even if there is an independent cause of action in tort.

Accordingly, there is a legal duty, implied in insurance contracts, that insurers, acting directly or through

---

[16] See Pgs. 1-2, Findings of Fact, Department of Labor and Industrial Relations 06-25-2003 Decision, Ex . "2".

their agents, must act in good faith in dealing with the insured, and breach of that duty of good faith gives rise to an independent tort cause of action.

On page 13 of its Memorandum, Defendant states "Assuming the Court finds that a duty exists between RSKCO and Mr. Backman, Count II of the Amended Complaint for breach of contract must be dismissed since there was no contract between Mr. Backman and RSKCO." Plaintiffs fail to see the logic of this reasoning: If Defendant is the agent of the insurer, and Daniel Backman is the intended third party beneficiary of the insurance contract, which as set forth above the defendant concedes, then *ipso facto* there is a contract "between" the adjuster and the insured.

Defendant offers no other argument against Count II of the Amended Complaint, so Plaintiffs assume the Defendant concedes that this Count is meritorious, as indeed it is. Each of the elements set forth in Count II is already the law of the case based on the October 29, 2001 decision of the Labor Board.

2. Plaintiffs Need Not Provide An Expert Witness To Establish That The Surgery Request Was Statutorily Approved And That Defendant's Conduct Breached Any Standard Of Care

On page 14 of its Memorandum, Defendant argues that "expert" testimony is required to establish whether defendant

14

breached its standard of care. This is not the case here, for the following reasons:

a. The standard of care is set by the Hawaii Administrative Rules, Rule 12-15-51(b), which states that failure to deny the surgery request "shall constitute approval of the request." (emphasis added) This is not analogous to the cases cited by defendant, since a regulation clearly establishes the standard. In fact, on October 29, 2001, the Director found:

> "On 1/16/2001, Dr. Graham requested authorization from employer to perform surgery at the C4-5 level because of radiculopathy at the C5. Employer did not submit a denial of the 1/16/2001 request until 6/22/2001. **Since employer's denial was not made within seven days of the requested surgery, employer failed to file a timely objection under Section 12-15-51 of the Workers' Compensation Medical Fee Schedule Administrative Rules** (WCMFSAR)." (emphasis added)

See Pg. 2, Director's 10-29-01 Decision, Ex. "1".

b. Any trier of fact is able to understand, without the assistance of expert testimony, that the defendant did not reject the request within seven days and was therefore absolutely required to provide the surgery Daniel Backman needed.

c. No expert witness is going to testify that disobeying and ignoring the law constitutes an acceptable practice; every expert would testify that Section 12-15-51 HAR means what it says for the obvious purpose of not delaying

needed medical care, the gross delay in this case having already been found to have cause Daniel Backman's death.

d.    The determination has already been made, by the Director that Defendant had to deny the surgery request within seven (7) days of the request and Defendant "failed to file a timely objection under Section 12-15-51 of the Worker's Compensation Medical Fee Schedule Administrative Rules[17].

e.    The Director found that Defendant was liable for Mr. Backman's surgery and that Mr. Backman's death was accidental and was a compensable death[18].    The Director further found that a "causal relationship between the initial neck injury and his demise from toxic combination of prescription narcotic medications and other medications has been established."[19]

f.    No expert is needed to testify that Defendant's withholding of records supporting the need for surgery from two independent medical examiners it consulted on the issue of the need for surgery breached any standard of care or was willful in nature.    To illustrate, the Director found that Defendant failed to provide key records to two (2) independent medical physicians;

---

[17] See Pg. 2, Finding of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".

[18] See Pg. 4, Findings of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex. "1"; Also see Pg. 5, Findings of Fact, Department of Labor and Industrial Relations 06-25-2003 Decision, Ex. "2"..

[19] See Pgs. 2-5, Finding of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".

"Another X-ray taken on 7/12/99 showed 4 mm anterior protrusion of bone density at the C4-5 disc level. A review of Peter E. Diamond, M.D.'s 3/7/2001 Independent Medical Evaluation (IME) and Stephen Holmes, M.D.'s 6/6/2001 consultation report indicates **both doctors were <u>not</u> provided films of the 4/99 and 7/99 cervical spine X-rays showing problems with the 3/99 fusion.**

. . .

Dr. Holmes, the selected neuroradiologist, reviewed the 12/15/2000 MRI only. **He did <u>not</u> review the X-ray films of the cervical spine taken in 4/99 and 7/99. His opinion is based upon incomplete medical records.**"

. . .

Dr. Holmes' (independent neuroradiologist) conclusion is based solely upon his reading of the 12/15/2000 MRI which, according to Dr. Holmes, was of marginal quality. **He did <u>not</u> have prior X-rays and MRI films to review and consider prior to drafting his 6/6/2001 report.**" (emphasis added).

<u>See</u> Pg. 2, Director's 10-29-01 Decision, Ex. "1". This is the law of the case. No expert is needed to assist the court in determining whether Defendant, after missing the deadline to deny the surgery request and submitting only selected records to the examiners, breached its duty of care. In fact, it is likely that the court, without an expert, can determine that this conduct was intentional and willful in a desperate and calculated attempt to retroactively justify denying the surgery request after missing the statutory deadline.

       g.   No Expert is Necessary to Prove That Defendant's Conduct Caused Mr. Backman's death.

On page 15 of its Memorandum, Defendant baldly asserts that "Plaintiffs do not have any expert testimony establishing that RSKCO's conduct caused Mr. Backman's death. Therefore,

17

Plaintiffs cannot prove that RSKCO caused their damages." To the contrary, the entire record of the proceedings before the Department of Labor, and its October 29, 2001, June 25, 2003 and August 29, 2003 opinions clearly establish that the conduct of the Defendant was the proximate cause of Daniel Backman's death. For example,

> "Regarding compensability of decedent's demise, **the Director determines that it is a compensable death based on the record.** Decedent developed chronic pain as a result of the work injury and neck surgery that did not provide symptomatic relief. As a result, decedent was prescribed narcotic medication to treat the chronic pain. Decedent developed narcotic dependency. **Prior to undergoing a second neck surgery, decedent died as a result of accidental combined toxic effects of his medications, oxycodone, methadone, and alprazolam. A causal relationship between the initial neck injury and his demise from toxic combination of prescription narcotic medications and other medication has been established.**" (emphasis added)

See Pg. 5, Director's 07-21-03 Supplemental Decision, Ex. "2". Furthermore, it is undisputed that for approximately twenty (20) months following Mr. Backman's initial 3-3-99 surgery, his doctors attempted to persuade Defendant to authorize surgery to relieve his continued neck pain. It is axiomatic that had Defendant approved the surgery request and not fought Mr. Backman and submitted incomplete records to the independent medical examiners, and not continue to deny the request, Mr. Backman would have had his surgery performed, had relief from his neck pain and would have been off or substantially off of

his pain mediations.    The point is that Defendant's conduct

deprived Mr. Backman of this opportunity for treatment which was

already statutorily approved.    The attempt to retroactively

create a controversy over the need for the treatment, by

providing what was, by reason of its incompleteness, a false

medical record for its experts to rely on, further compounds

that bad faith misconduct of the Defendant.    That this delay

caused Daniel Backman to suffer more than would otherwise have

been the case is illustrated by Dr. Graham in his May 1, 2001

letter wherein he stated in pertinent part;

> "It is my <u>concern</u> that <u>continued</u> delays may not only
> undermine any gains to be obtained by surgery on Mr.
> Backman but also lengthen the postoperative recovery
> and expose him to coexisting conditions, such as a
> frozen shoulder, which commonly develops after a long
> period of chronic neck and arm pain.    The presence of
> these complications often lengthens the recovery time
> and increases the costs of postoperative care.
> (emphasis added)

<u>See</u> Jon Graham, M.D.'s 5-1-2001 Letter, Ex. "3".    It is

undisputed that Defendant vehemently resisted approval of the

surgery request, that throughout this time Mr. Backman was on

increasingly high doses of narcotics for his unbearable and

unmanageable neck pain, and that the surgery was intended and

expected to relieve this.    At trial, his surgeon will testify

that Defendant continually opposed his surgery requests and that

the surgery was necessary to relieve Mr. Backman's pain and

reduce or eliminate the need for pain medication.

19

3.   <u>Defendant's Denial Was In Bad Faith</u>.

On page 15 of its Memorandum, Defendant claims "The denial of Dr. Graham's surgical request was not in bad faith." This ignores the fact that there was no denial within seven days of the request, and that even after the seven day period ran, Defendant attempted to control the conclusions of its experts by submitting only selected records to the its independent examiners.  Moreover, in fact, Defendant denied Mr. Backman's surgery request even though neither Dr. Diamond nor Dr. Holmes opined that surgery was not necessary.  Instead, Dr. Diamond asked for more records and Dr. Holmes questioned the levels at which the surgery was going to address, both of which are the reasonable consequences of Defendant's attempt to sway their opinions.

Moreover, it is undisputed that when Defendant issued its denial on June 6, 2001, it did not mail a copy of the denial to Mr. Backman as required.  Instead, Mr. Backman found an envelope in his mailbox, stamp uncancelled, addressed to him from Defendant with no postmark stamp.  The most likely conclusion is that at some point in time, Defendant had someone drop the envelope in the Backman family mailbox.  The Director found "Employer has no explanation as to why the denial letter

envelope addressed to claimant has no postmark stamp on it[20].

This tactic was likely a ploy to ensure that Defendant, who was

incompetent from his high doses of narcotics and no longer

represented by counsel, would not be able to timely file a

request for a hearing on the denial[21]. This is especially the

case when only Defendant would have a "record" of the date the

denial was "sent."

Furthermore, Defendant's conduct in attempting to

create an *ex post facto* reasonable denial was bad faith in and

of itself, and included willful conduct that included among

other things, hiring two physicians to review Daniel Backman's

medical records to obtain an opinion favoring denial. It did

this long after the applicable seven day period had lapsed and

it sent only about selected records and none of the critical X-

rays to the examiners. Amazingly, despite the examiners not

opining that surgery was not indicated, Defendant still denied

Mr. Backman's surgery request.

4. Defendant Tried to Mislead The Medical Examiners.

Defendant attempted to mislead the examiners, not just

by providing them with incomplete records, but by deliberately

drafting its query so as to draw the examiners' attention away

from the separated bone plug. To illustrate, after Dr. Graham

---

[20] See Pgs. 2-3, Finding of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".

[21] At this time, Mr. Backman no longer was represented by counsel and he retained new counsel when he found the unpostmarked envelope from Defendant in his family's mailbox. See Pg. 2, Findings of Fact, Department of Labor and Industrial Relations 10-29-2001 Decision, Ex . "1".

submitted his surgery request, Defendant contacted Dr. Graham and inquired about a "change" in Mr. Backman's condition that would necessitate surgery. See Defendant's Ex. "13". It was improper for Defendant to attempt to shift the burden of proof to Dr. Graham to demonstrate a "change" in Mr. Backman's medical condition. Dr. Graham's request for the surgery was not based on a "change" in Mr. Backman's condition. The condition had existed from the prior surgery, as shown in the April, 1999 X-rays. Dr. Graham responded to Defendant by stating that "This is to acknowledge . . . your 01/19/01 request regarding changes in Mr. Backman's medical condition . . . Mr. Backman has not improved with conservative therapy. As expected, his MRI is unchanged. He still continues to have increasing neck and left arm pain which could be helped by surgery performed at the C4-5 level." See Jon Graham's 01-23-2001 Letter, Ex. "4". Dr. Graham makes clear that no changes in the MRI were expected but that Mr. Backman had increasing pain and was having increased pain. Mr. Backman's debilitating symptoms in his neck and arm had not improved with prolonged conservative therapy, and therefore surgery was warranted to reduce his radiating neck pain and reduce his narcotic medication needs. In fact, Dr. Graham's 10-24-2000 report to Dean Otaka, M.D. makes clear that the April 1999 X-ray films revealed that the bone graft had

collapsed and was protruding.  See Graham 10-24-2000 Report, Ex.

"5".  The X-ray report provided in pertinent part;

> "Suspect **incomplete incorporation** of the bone plug to
> the C4 and C5 vertebral bodies.
>
> The anterior portion of the bone plug may be **separated**
> from the remaining bone plug localized to the C4-5
> disc level and the anterior portion of the bone plug
> measuring approximately 15 x 7 mm may have **migrated**
> slightly cranially. . ." (emphasis added)

See 4-22-99 X-ray Report, Ex. "6".  Similarly the 7-12-99 X-ray

report documented the following;

> "There is anterior fusion with the bone plug seen at
> C4-5 disc level.  The bone density anterior to the C4-
> 5 disc level now appears to be contiguous with the
> bone plug.
>
> This density however still **protrudes** about 4 mm
> anterior to the vertebral bodies. . .
>
> Impression:
>
> Bone plug at C4-5 with anterior **protrusion** of a bony
> density at the C4-5 disc level." (emphasis added)

See 7-12-99 X-ray Report, Ex. "7".  Despite the pertinence and

importance of the X-rays, Defendant withheld them from its

examiners.  Defendant deliberately, consciously and willfully

only provided its experts with the later MRIs, which Defendant

knew do not show bony changes;  Defendant then asked them to

report whether the MRIs showed any changes.  Defendant

deliberately and carefully crafted this question to avoid

drawing attention to the failed bone fusion.  Defendant artfully

drew the examiner's attention to whether any changes could be

seen on the MRI, knowing none would be apparent, since both were taken after the failed surgery; Defendant also asked what level of surgery was indicated, knowing that also would not be apparent from the material provided. Defendant did not even make the referrals for opinions until months after the subject seven day period had passed, all the while Daniel Backman was suffering unbearable and unmanageable pain.

5.    Defendant Failed to Pay PPD Payments As Required.

Defendant misleads the court by simply claiming that that it had prevailed on the payment of the PPD benefits and therefore the non-payment of PPD benefits cannot form the basis for Plaintiffs' bad faith claims, when it fact the PPD issues were appealed to the Hawaii Supreme Court and have been sent back to the Department of Labor where these issues remain unresolved today.

6.    Defendant Admittedly Paid Benefits Late.

On page 17 of its Memorandum, Defendant states that the benefits it was to pay to the Plaintiffs are "benefits that were due within 31 days of August 29, 2003" and concedes that these were not paid until October 3, 2003. Defendant has thereby admitted the allegations of paragraphs 47 and 48 of the Amended Complaint. Due to the Defendant's dilatory conduct and refusal to pay pursuant to the June 25, 2003 Decision, as well as the October 29, 2001 Decision, Daniel Backman's widow and

surviving children continued without funds for an unreasonably long period of time.    These late payments combined with Defendant's established pattern of denial and delay is illustrative of Defendant's bad faith conduct.    Moreover, Plaintiffs' worker's compensation lawyer had to fight this issue at the worker's compensation level, incurring unnecessary attorney's fees and costs.

> 7.    The Statute Of Limitations Has Not Run on Any Cause of Action and Could Not Have Run Against The Backman Children

On page 18 of its Memorandum, Defendant states that the statute of limitations has expired because the alleged bad faith conduct, delaying a decision and denying the surgical request, took place between January 16, 2001 and June 22, 2001. However, the statute of limitations did not begin to run simply because Defendant missed the January 23, 2001 deadline or because it issued a formal denial on June 22, 2001, but rather the statute of limitations began to ran when Mr. Backman died. One does not have a claim until there is an injury or death. Plaintiffs contend that Mr. Backman died as a result of accidentally overdosing on increasingly high doses of narcotic medication necessitated by Defendant's ongoing bad faith conduct in resisting his surgery request.    A negligence action accrues under Section 657-7 HRS and the statute of limitations commences when a plaintiff has actual or imputed knowledge of (1) his

25

injury; (2) the defendant's negligence or breach of legal duty and (3) the causal connection between the two. Iida v. Allied Signal, Inc., 854 F. Supp. 702 (D. Haw. 1994). Here, Mr. Backman did not die until January 2, 2002 and this matter was filed on October 29, 2003, well within the applicable two year limitations period.

The claims of Daniel Backman, now held by his estate, commenced at the earliest when he had exhausted his administrative remedies, as of the issuance of the October 29, 2001 Decision of the Department of Labor. None of the other claims of the Plaintiffs arose until Daniel Backman died. There was no Estate of Daniel Backman, one of the Plaintiffs herein, until Mr. Backman died. His wife, Julie Backman, did not become a widow and did not suffer the losses complained of until her husband died. His children did not lose their father until Mr. Backman died. Moreover, as it is undisputed that both of Mr. Backman's children who are plaintiffs are minors, no statute of limitations could have run against their claims.

8.   Punitive Damages are Clearly Warranted.

Defendant is disingenuous in claiming that punitive damages should not be awarded because its conduct was not unreasonable and that it did nothing wrong. However, the findings of fact in the underlying worker's compensation case establish that Defendant acted willfully, maliciously,

26

oppressively and/or fraudulently and with a spirit of mischief and/or criminal disregard for the consequence of its actions.

　　　　As set forth above, Defendant disregarded and failed to comply with Hawaii Administrative Rules, Rule 12-15-51, which provides that any request not denied within seven days is deemed approved.  And, despite having failed to deny the request before the deadline, which meant that the request was deemed approved as a matter of law, Defendant ignored the Administrative Rule and undertook a scheme to create a record for its destined denial.  It withheld the key X-rays and X-ray reports from the independent examiners.  It never directed its examiners to the issue of the failed bone plug, and instead drew their attention away to the MRIs which would not show any bony changes.  Then, despite none of the examiners actually opining that surgery was not indicated, it nonetheless still denied the surgery request. In addition, in denying the request, it did not mail the denial to Mr. Backman and instead placed a non-postmarked copy of the denial in his mailbox on an unknown date sometime on or after June 22, 2001.  Interestingly, Defendant "had no explanation as to why the denial letter envelope addressed to claimant has no postmark stamp on it." (emphasis added) See Pg. 3, Ex. "1".  Mr. Backman took the letter to his new attorney, who promptly requested a hearing on the denial, which request was allegedly late, based solely on Defendant's representations as to when it

27

"mailed" the denial. Defendant then persisted for many more months in refusing to approve the surgery request, until finally the Director found Defendant liable to pay for the surgery. Defendant's established and ongoing conduct reflects "something more" than conduct necessary to establish a tort, that Defendant acted wantonly, oppressively with such malice as implies a spirit of mischief or some willful misconduct or entire want of care designed to deny Mr. Backman's surgery, and this led directly to Mr. Backman's untimely death.

Defendant's willful and deliberate refusal to follow the procedural requirements of the rule caused Daniel Backman's last 343 days of life to be unbearably miserable. During all of this time, he was on increasing doses of pain medication, he suffered from depression and anxiety, he was frequently groggy and marginally able to attend to affairs, none of which would have been necessary had Defendant accepted that it had not denied the request within the required time and that therefore the surgery had already been approved as a matter of law.

As set forth above, in an effort to create a retroactive controversy over the substance of the request, defendant hired physicians to give opinions that might shore up its position. Yet, Defendant was no longer entitled to controvert the request, since the request was already deemed approved by operation of law. Nonetheless, Defendant attempted

to sway the opinion of its examiners by withholding key medical records from them, including the critical X-rays and by misleading the physicians into believing that that there was a dispute as to the level of the needed surgery. Then, despite the fact that neither physician opined that surgery was not required, it still issued a written denial of the request, falsely claiming the examiners had disapproved the surgery, but failed to mail a copy of the denial to Mr. Backman. Instead, at some point in time, it placed a copy of the denial in the Backman family mailbox. The actual date when this was done, which would start the running of an appeal period, (had the denial been made during the seven day period January 11-18 rather than June 22, 2001) is not known because Mr. Backman was under heavy medication. He brought the copy of the denial to his attorney, but by that time the time to challenge the denial has lapsed, according to the date supplied by the Defendant. In any event, the Director did not find the denial to be effective. As it happens, Defendant was foiled in its attempt as neither physician opined that the surgery was not required; rather they were each unsure as to which vertebrae was involved, which is the natural consequence of not having been shown the X-rays or given the entire record to review. Defendant makes much of the fact that these physicians had this uncertainty, which it had itself created.

Beginning on page 19 of its Memorandum, Defendant appears to be arguing that summary judgment should be granted because plaintiffs "cannot establish that RSKCO's conduct warrants an award of punitive damages." By pointing out this question of fact, Defendant actually establishes the inappropriateness of summary judgment. Whether Defendant's conduct meets the standard set forth in *Best Place, Inc. v. Penn America Insurance Company,* 82 Haw. 120, 134, 920 P.2d 334, 348 (1996) justifying punitive damages is an unresolved question of fact. Defendant's wrongful conduct has already been established in the underlying worker's compensation case, so its claim that punitive damages will not lie in the absence of an underlying case of action is not pertinent.

A trier of fact could reasonably conclude that the persistent and repeated delays, the refusal to follow the Hawaii Administrative Rules and acknowledge that approval was already granted as a matter of law; the failure to comply with the Decisions of the Director, in some cases in a timely fashion and in other cases at all; and the attempt to *ex post facto* establish an irrelevant controversy over the treatment by deliberately and willfully withholding pertinent records from its examiners, and misdirecting them as to the reason for the surgery request, justifies an award of punitive damages, in that

this conduct does indeed reflect 'something more," than the conduct necessary to establish the tort.

> "[W]e hold that punitive damages may not be awarded in a bad faith tort case unless the evidence reflects "something more" than the conduct necessary to establish the tort. More specifically, the plaintiff must prove by clear and convincing evidence the "the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some willful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences," *American Best* at 134, *citing Masaki v. General Motors Corp.,* 71 Haw. 1, 780 P.2d 566 (1989)."

Ibid. Whether plaintiffs can establish such facts is a question that must go to the trier of fact. For that reason, and the reasons stated above, summary judgment should not be granted.

Finally, as discovery is continuing, if the court is inclined to grant the motion, Plaintiffs respectfully requests that the court stay any ruling on this motion pending the completion of the depositions of the insurance adjusters, attorneys and certain doctors.

III. Conclusion

Based on the foregoing, Plaintiffs respectfully submit that the instant motion be denied.

Dated: Honolulu, Hawai'i, _____March 10, 2006_____.

_____
ROBERT D. KAWAMURA

Attorney for Plaintiffs

31

JULIA  M. BACKMAN, individually
and on Behalf of the ESTATE OF
DANIEL VERNON BACKMAN, Deceased,
and as Next Friend to KELLY KEIKO
VALENE BACKMAN and JODI LEIGH
YACHIYO BACKMAN, Minors